**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| **ANTHONY CHONG** *et al.*, | : | **CIVIL ACTION** |
| *Plaintiffs*, | : | |
| **v.** | : | |
| | : | |
| **7-ELEVEN, INC,** | : | **NO. 18-1542** |
| *Defendant.* | : | |

## M E M O R A N D U M

PRATTER, J.                                                                                    FEBRUARY 27, 2019

Anthony Chong operated 7-Eleven franchises in Pennsylvania for more than two decades.
In 2004, Mr. Chong transferred ownership of his franchises to MT133132, Inc., which Mr. Chong
incorporated.[1]  In 2004 and 2008, Mr. Chong signed amended franchise agreements on behalf of
MT133132, Inc.  Starting around 2011, the plaintiffs claim that 7-Eleven tried to squeeze them out
of the Franchise Agreements economically and breached the Franchise Agreements in several
ways.  They claim that they are not the only longstanding franchisees in 7-Eleven's crosshairs and
accuse 7-Eleven of a region-wide scheme, dubbed "Operation Philadelphia," intended to force
older franchisees to terminate their franchise agreements so that 7-Eleven can enter into new
agreements on more favorable terms.  The plaintiffs are no longer 7-Eleven franchisees, and they
accuse 7-Eleven of issuing bad faith inspection reports as a pretext for terminating their franchises.

In their original complaint, the plaintiffs brought claims for breach of the covenant of good
faith and fair dealing and breach of contract.  In turn, 7-Eleven filed counterclaims for breach of

---

[1]        MT133132, Inc. is also a plaintiff in this case.  The distinction between the plaintiffs is
relevant only to determine whether Mr. Chong has standing to bring individual claims, as discussed
in Section IV, *infra*.  For ease of reference throughout the rest of this Memorandum, the Court
refers to MT133132, Inc. and Mr. Chong collectively as "the plaintiffs."

1

contract, claiming that the plaintiffs breached the Franchise Agreements by, among other things, failing to properly prepare cash reports, failing to prepare and furnish to 7-Eleven daily reports of purchases and other inventory transactions, and failing to pay all sales and income taxes.

Thereafter, the plaintiffs filed an amended complaint. They re-pleaded the breach of the covenant of good faith and fair dealing claim and breach of contract claim, and they added new claims, including unconscionability, unjust enrichment, impracticability, conversion, and fraud. 7-Eleven filed a motion to dismiss the amended complaint. 7-Eleven also filed a motion to stay arbitrable claims, arguing that new aspects of the plaintiffs' breach of contract claim concerning vendor negotiating practices must be stayed pending mandatory arbitration, as required by the Franchise Agreements. The Court held oral argument on these motions and allowed the parties to file supplemental briefing.[2]

**As discussed in Section I below**, the plaintiffs' breach of the covenant of good faith and fair dealing claim will survive because Pennsylvania courts recognize that franchise agreements impose a duty upon franchisors not to act arbitrarily in terminating franchise agreements, and the plaintiffs sufficiently alleged that 7-Eleven terminated the Franchise Agreements in bad faith.

**In Section II**, the Court addresses the plaintiffs' breach of contract claim. Although the breach of contract claim makes up only one count of the amended complaint, it can be broken down into seven separate claims of breach: **First**, the Court will dismiss the plaintiffs' breach of contract claims concerning (1) merchandise audits; and (2) charges the plaintiffs must pay if they do not buy enough products from recommended vendors. **Second**, the breach of contract claims concerning (3) maintenance requests; (4) failure to treat the plaintiffs as independent contractors;

---

[2]     The Court also held oral argument in a case brought against 7-Eleven by another franchisee involving similar claims. *See Takiedine v. 7-Eleven, Inc.*, Civ. No. 17-4518. The Court very recently issued a separate memorandum and order in *Takiedine*.

(5) failure to provide the plaintiffs advertising reports; and (6) failure to provide the plaintiffs notice of increased credit card fees will survive, at least in part. **Third**, the breach of contract claim concerning (7) 7-Eleven's failure to secure the lowest prices for franchisees from its vendors—including the related claim that manufacturers and vendors who sell 7-Eleven's proprietary products to franchisees do not provide a return or sales credit in the event these products remain unsold—will be stayed for arbitration pursuant to the Franchise Agreements.

**In Section III,** the Court addresses the additional claims in the amended complaint. The Court will dismiss the plaintiffs' claims for impracticability and unconscionability because they are not recognized causes of action under Pennsylvania law. The Court will also dismiss the fraud claim because it does not meet the heightened pleading requirements. However, the plaintiffs' claims for unjust enrichment and conversion survive.

**Finally, in Section IV**, the Court will dismiss all of Mr. Chong's individual claims because he is not a party to the Franchise Agreements. Only MT133132, Inc will be permitted to proceed as a plaintiff.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"). Also, the Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183–84 (3d Cir. 2000) (citations and internal quotation marks omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions") (citations omitted).

**DISCUSSION**

**I.     Breach of the Covenant of Good Faith and Fair Dealing**

In Count I of the amended complaint, the plaintiffs claim that "by imposing unreasonable charges that have entirely diminished Plaintiff[s'] profits, targeting Plaintiff[s'] store for 'take back,' and wrongfully terminating Plaintiff[s'] stores, Defendant's actions against Plaintiff[s] constitute a breach of the Covenant of Good and Fair Dealing[]."  The plaintiffs also allege that 7-Eleven "issued bad faith inspection reports and letters of notification as a pretext for terminating [the Franchise Agreements]."  7-Eleven argues that the plaintiffs' good faith claim should be dismissed because they fail to allege how the termination was wrongful under the terms of the Franchise Agreements.  However, at this stage, the plaintiffs have met their burden.

Pennsylvania courts have recognized that "a franchise agreement imposes a duty upon franchisors not to act arbitrarily in terminating the franchise agreement."  *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 742 (Pa. 1978).  Thus, "a franchise relationship may be terminated by the franchisor only when consistent with '[the franchisee's] reasonable expectations, principles of good faith and commercial reasonableness,' or where the termination is specifically provided for by the contract."  *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 555 (E.D. Pa. Mar. 4, 2008) (quoting *Razumic*, 390 A.2d at 743).   Although the precise contours of the good faith duty in the franchise relationship have not been established by the Pennsylvania Supreme Court, it "has at least indicated that the duty applies in cases 'of direct or indirect termination.'"  *Id.* at 556 (quoting *Witmer v. Exxon Corp*, 434 A.2d 1222, 1227 (Pa. 1981)).  And courts in this district have declined to dismiss breach of the covenant of good faith and fair dealing claims where plaintiffs alleged bad faith termination.  *See id.* (declining to dismiss a breach of the covenant of good faith and fair dealing claim where the plaintiff franchisee alleged

5

bad faith termination); *Cottman Transmission Sys. v. McEneany*, Civ. No. 05-6768, 2007 U.S. Dist. LEXIS 5061, at *33 (E.D. Pa. Jan. 17, 2007) (same).

The plaintiffs claim that they complied with the terms of the Franchise Agreements, that their franchises were wrongfully terminated, and that 7-Eleven "issued bad faith inspection reports and letters of notification as a pretext for terminating" them. Although 7-Eleven may ultimately prove that it lawfully terminated the plaintiffs' franchises in accordance with the Franchise Agreements, the Court is obligated to accept the plaintiffs' allegations as true at this stage in the litigation. Therefore, the breach of the covenant of good faith and fair dealing claim will survive.[3]

## II. Breach of Contract

In Count II of the amended complaint, the plaintiffs re-plead their breach of contract claim. 7-Eleven argues that the plaintiffs fail to state a claim for breach of contract because they do not identify the provisions of the Franchise Agreements allegedly breached. Likewise, 7- Eleven argues that the plaintiffs do not plead each of the elements of breach of contract as to any particular breach. 7-Eleven also filed a separate motion arguing that to the extent the plaintiffs' breach of contract claim touches on its vendor negotiating practices, that claim should be stayed for arbitration pursuant to the Franchise Agreements.

Although the plaintiffs do not cite to specific contractual provisions in the amended complaint, they do provide enough information for 7-Eleven and the Court to determine which

---

[3]    The Court notes that the plaintiffs' breach of the covenant of good faith and fair dealing claim may proceed only to the extent that it relates to the alleged wrongful termination of the franchises. Additional allegations within Count I—including allegations that 7-Eleven imposed unreasonable charges thereby diminishing the plaintiffs' profits—are foreclosed to the extent that they do not relate to termination. *See* Memorandum at 5, *Takiedine v. 7-Eleven*, Civ. No. 17-4518 (E.D. Pa. February 22, 2019) ("[U]nder Pennsylvania law[,] standards of good faith and fair dealing apply to franchise relationships only in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee.").

contractual provisions are supposedly at issue. The plaintiffs' breach of contract claim is packaged into one count in the amended complaint, but it can be broken down into seven separate claims of breach. As discussed here, the Court will dismiss two of these claims because they are insufficiently pleaded, four will survive, at least in part, and the plaintiffs' vendor negotiating practices claims—including their claims concerning 7-Eleven's proprietary products—will be stayed for arbitration.[4]

Under Pennsylvania law, a claim for breach of contract requires three elements: "(1) the existence of a contract, including its material terms, (2) breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citation omitted). Although "not every term of a contract must be stated in complete detail, every element must be specifically pleaded." *Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 658 n. 20 (E.D. Pa. Feb. 5, 2010) (quoting *CoreStates Bank, Nat'l Assn. v. Cutillo*, 732 A.2d 1053, 1058 (Pa. Super. 1999)). "When allegations contained in a complaint are contradicted by the document it cites, the document controls." *In re PDI Sec. Litig.*, Civ. No. 02-211, 2005 U.S. Dist. LEXIS 18145, at *66 (D.N.J. Aug. 17, 2005).

### A. The Plaintiffs' Insufficient Breach of Contract Claims

The two claims discussed below are inconsistent with the language of the Franchise Agreements or are otherwise insufficiently pleaded. Therefore, they will be dismissed.

---

[4] In the Court's estimation, as also observed in the *Takiedine* litigation referred to *supra*, splitting the handling of the claims being pursued—with the primary bundle being addressed here on the one hand, and the one claim subject to arbitration on the other—is unfortunate for the parties in terms of efficiency or economic case management. However, even though it would be desirable for the entirety of this dispute to be resolved in a single forum, that result apparently is not feasible in this instance, given the persistent demand for arbitration, as addressed, *infra*.

1. *Fair and Accurate Merchandise Audits*

The plaintiffs claim that 7-Eleven "has not been conducting fair and accurate merchandise audits as required by the Franchise Agreements, and wrongfully charged Plaintiff[s] for the erroneous shortages." The source of this claim appears to be Section 14 of the Franchise Agreements. Section 14, titled "Audit Rights," states that 7-Eleven agrees to conduct at least one audit each calendar quarter. However, Section 14 explicitly states that "Audits shall be binding within twenty-four (24) hours after receipt of such report unless either party gives notice that such party believes the Audit to be incorrect."

Even assuming 7-Eleven's audits were inaccurate, the plaintiffs do not claim that they objected to the audits within the specified period or otherwise assert how 7-Eleven's alleged unfair and inaccurate audits breached the Franchise Agreements. Likewise, the plaintiffs do not articulate a challenge to the terms of the provision itself or why they could not meet these terms. Therefore, the Court will dismiss the breach of contract claim concerning "fair and accurate merchandise audits."

2. *Recommended Vendors*

The plaintiffs include two paragraphs in their breach of contract claim stating that "if Plaintiff[s] do[] not buy non-proprietary products from the vendors that 7-Eleven wants [them] to, 7-Eleven will unilaterally increase its split of the profits." However, the plaintiffs do not further explain how this constitutes a breach of the Franchise Agreements. Rather, as 7-Eleven points out, Section 15(g) of the Franchise Agreements expressly requires the plaintiffs to purchase 85% of their stores' merchandise from 7-Eleven's recommended vendors, and a related provision, Section 10(b), permits 7-Eleven to increase the "7-Eleven Charge" by two percent if the plaintiffs do not meet the recommended vendors requirement. Although the plaintiffs describe these provisions as

onerous and negatively affecting their stores' profits, they do not explain anywhere in the amended complaint how 7-Eleven violated them. Therefore, this claim will be dismissed.

**B. The Plaintiffs' Sufficient Breach of Contract Claims**

The four claims discussed below have been sufficiently pleaded, at least in part and for present purposes. Therefore, the Court will not entirely dismiss them at this stage in the litigation.

1. *Failure to Provide Necessary Maintenance*

As 7-Eleven readily admits, the plaintiffs' strongest claim for breach of contract involves 7-Eleven's alleged failure to provide maintenance to their stores as required by the Franchise Agreements. Specifically, the plaintiffs claim that their maintenance requests concerning an air conditioning unit have gone unheeded. These claims appear to arise out of Section 20(d) of the Franchise Agreements. Section 20(d) provides that "[w]hen we [7-Eleven] consider it necessary during the Term of this Agreement, we agree to . . . (6) maintain the HVAC Equipment."

7-Eleven argues that this claim should be dismissed because the plaintiffs fail to allege an essential component of the obligation claimed to have been breached: that 7-Eleven considered the sought repairs "necessary." Although the plaintiffs did not specifically allege that 7-Eleven considered the repairs necessary, they sufficiently pleaded this breach of contract claim. 7-Eleven was certainly on notice of the nature of the claim, and whether 7-Eleven considered these repairs necessary and whether its failure to provide the requested maintenance breached the contract can be determined at a later stage in the proceeding with the benefit of a factual record.

2. *Failure to Treat as Independent Contractors*

The plaintiffs also allege that 7-Eleven failed to treat them as independent contractors "as set forth in the Franchise Agreements by, *inter alia*, forcing Plaintiff[s] to sell products that [they] did not order and interfering with Plaintiff[s'] management of [their] staff and communicating

directly to Plaintiff[s'] staff in a harmful way." The plaintiffs argue that this claim arises from Section 2 of the Franchise Agreements. Section 2 states that the parties "agree that this Agreement creates an arm's-length business relationship and does not create any fiduciary, special or other similar relationship." It also states that the franchisee agrees "(a) to hold [itself] out to the public as an independent contractor; (b) to control the manner and means of the operation of the Store; and (c) to exercise complete control over and responsibility for all labor relations and the conduct of [its] agents and employees, including the day-to-day operations of the Store and all agents or Store employees." Finally, Section 2 states that 7-Eleven does "not exercise any discretion or control over [the franchisee's] employment policies or employment decisions."

7-Eleven argues that Section 2 does not require 7-Eleven to treat the plaintiffs as independent contractors. Rather, it claims that Section 2 only creates obligations for the plaintiffs. 7- Eleven may—with evidence—prove that Section 2 does not create any contractual obligations. However, at this stage in the proceeding, without the benefit of a factual record, the Court is not prepared to interpret this provision or dismiss this claim.

3. *Failure to Provide Advertising Reports*

The plaintiffs next argue that 7-Eleven "failed to market and advertise as agreed, and further failed to provide[] advertising reports . . . as required by the Franchise Agreements." The source of this claim appears to be Section 22 of the Franchise Agreements. Under Section 22, the plaintiffs agreed to pay 7-Eleven an advertising fee. Section 22(a)(3) states that 7-Eleven has "and will continue to have the sole and absolute right to determine how Advertising Fees will be spent . . . and that [7-Eleven has] no fiduciary obligation to you or to other 7-Eleven franchisees with respect to such determinations or expenditures of the Advertising Fees." Section 22(a)(4) further states that 7-Eleven undertakes "no obligation to make expenditures of Advertising Fees which are

equivalent or proportionate to a franchisee's Advertising Fee payment or to ensure that any particular franchisee benefits directly or pro rata from such expenditures . . . ." And Section 22(a)(6) requires 7-Eleven to "advise [the plaintiffs] annually of Advertising Fee receipts and [its] advertising expenditures, including in what markets the sums were spent and the type of advertising done, all in the form and manner in which we [7-Eleven] determine in our sole discretion to be appropriate."

Because the contract gives 7-Eleven complete discretion over how to spend the Advertising Fees, the Court will dismiss the plaintiffs' claim concerning 7-Eleven's alleged failure to market and advertise as agreed. However, the plaintiffs' narrower claim concerning 7-Eleven's alleged failure to provide advertising reports will survive. Whether 7-Eleven's alleged failure to provide advertising reports harmed the plaintiffs in any meaningful way can be tested at a later stage in the proceeding.

### 4. _No Written Notice of Credit Card Fees and Credit Card Fees Have Greatly Increased_

The plaintiffs claim that 7-Eleven breached the Franchise Agreements because they did not receive notice of 7-Eleven's decision to impose credit card fees, as allegedly required by the Franchise Agreements, and because the fees for credit card transactions have "greatly increased." Because the amendments to the Franchise Agreements pertaining to credit card fees differ for each of the plaintiffs' stores, they will be addressed separately.

**As for Store Number 1408-33380 B**, the plaintiffs' allegations concerning credit card fees arise from an amendment to the Franchise Agreements titled "Credit Card Amendment Stores Without Gasoline," signed by Mr. Chong on October 20, 2004.[5] Section 7 of the Credit Card

---

[5] Mr. Chong signed these amendments to the Franchise Agreements on behalf of MT133132, Inc, not in his individual capacity.

Amendment Stores Without Gasoline sets out the plaintiffs' obligation to pay a credit card fee and a formula for the fee's calculation. It further states that "We [7-Eleven] may change the Fee Percentage at any time in our sole discretion by giving you 30 days written notice. We are currently not charging this credit card fee to any franchisee. We will notify you if we intend to resume charging these fees."

In response, 7-Eleven argues that a different amendment to the Franchise Agreements titled "NON-OFFF Existing Franchise Amendment to Franchise Agreement"—also signed by Mr. Chong on October 20, 2004—supersedes the Credit Card Amendment. Section 3 of the NON-OFFF Amendment states that "[w]e [7-Eleven] will not change our policy of paying for the portion of credit card fees for which you are responsible with respect to non-gasoline sales at your Store until January 1, 2005. . . . You agree that at any time after such date[] we can change such polices in any manner we determine, and we can change any of our other non-contractual policies at any time in our sole discretion." 7-Eleven argues that the NON-OFFF Amendment controls because it contains a provision stating that it "supersede[s] any inconsistent or conflicting provisions in the Franchise Agreement," thereby alleviating it from any duty to provide notice of a change in the credit card fees. 7-Eleven also argues that the plaintiffs could not possibly have suffered damages from its alleged failure to give them advanced notice of the increase in credit card fees.

However, the Credit Card Amendment Stores Without Gasoline also contains a provision stating that "[t]his Amendment supersedes and replaces all other agreements, if any, between you and us relating to the acceptance of credit cards at the Sore." Therefore, without a factual record, the Court declines to rule on which amendment to the Franchise Agreements is controlling for Store Number 1408-33380 B, how much—if any—notice 7-Elven was obligated to provide the

plaintiffs before implementing credit card fees at this store, and whether 7-Eleven's alleged failure to notify the plaintiffs harmed them in any meaningful way.

**In contrast, Store Number 1408-1136 E** is governed by a more recent amendment titled "Credit Card Amendment." The Credit Card Amendment—signed by Mr. Chong in his representative capacity on May 27, 2008—states that "You [franchisee] agree to pay us [7-Eleven] a fee (the 'Credit Card Fee') for each Credit Card transaction processed under this Amendment, unless otherwise specified in this Amendment." Unlike the Credit Card Amendment Stores Without Gasoline pertaining to Store Number 1408-33380 B, this Credit Card Amendment does not reference the fact that 7-Eleven was not charging franchisees credit card fees or state that 7-Eleven would provide notice if it decided to implement such a fee. Thus, the plaintiffs' claim regarding notice of the imposition of credit card fees for Store Number 1408-1136 E will be dismissed.[6]

### C. *Vendor Negotiating Practices and 7-Eleven's Motion to Stay Arbitrable Claims*

Finally, the plaintiffs claim that 7-Eleven is obligated to "make every commercially reasonable effort to obtain the lowest cost for products and services available," but "[d]espite the terms of the agreement, which state otherwise, 7-Eleven, Inc. is not getting the lowest price for the Plaintiff." Relatedly, the plaintiffs claim that 7-Eleven requires them to purchase and carry certain proprietary products in their stores, including "7-Select" products, and that—unlike with national

---

[6]     The plaintiffs also claim that "the charges by Defendant against Plaintiff[s] for credit card transactions have greatly increased over the years since the Franchise Agreements were signed," thereby diminishing their profits. However, the plaintiffs do not claim or otherwise suggest that the credit card fees were calculated contrary to the formulas provided in the various credit card amendments, exceeded the fees charged by the credit card companies, or otherwise breached the Franchise Agreements for either store. Therefore, the plaintiffs will not be able to pursue any claims concerning the amount of the credit card fees charged. Rather, the credit card fee claim will be limited to 7-Eleven's alleged failure to provide the plaintiffs with the required notice for Store Number 1408-33380 B. The significance of any such failure remains to be seen.

brand name foods—they are not entitled to a return or sales credit in the event these proprietary products go unsold. Instead, they must take a loss in the form of a less advantageous write-off.

7-Eleven, in turn, argues that these claims arise from 7-Eleven's vendor negotiating obligations set out in Section 15(j) of the Franchise Agreements, and that Section 15(k) requires disputes arising out of or related to Section 15(j) be resolved in binding arbitration. In response, the plaintiffs argue that 7-Eleven has waived its right to arbitration and that, in the alternative, their claims concerning 7-Eleven's proprietary products are not within the scope of the arbitration provision.

The Federal Arbitration Act requires courts to "rigorously enforce" arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Under the FAA and Pennsylvania law, "a district court must compel arbitration if it finds (1) that a valid arbitration agreement exists between the parties, and (2) that the dispute before it falls within the scope of this agreement." *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 328 (E.D. Pa. Oct. 20, 2004) (citing *McAlister v. Sentry Ins. Co.*, 958 F.2d 550, 553 (3d Cir. 1992)). The plaintiffs do not challenge the validity of the arbitration provision in the Franchise Agreements. Therefore, the Court need only determine whether 7-Eleven waived its right to demand arbitration and whether the plaintiffs' claims concerning proprietary products fall within the scope of the arbitration provision. Because the Court finds that 7-Eleven did not waive its right to arbitration and that the plaintiffs' proprietary products claims fall within the scope of the arbitration provision, the Court will stay these claims to allow the parties to promptly pursue arbitration.[7]

---

[7] To repeat, if the parties seek an efficient and economical resolution of the entire dispute between them, they may still sensibly and jointly waive arbitration and allow all the issues to be resolved in this litigation.

1.  *7-Eleven Has Not Waived Its Right to Arbitration*

"Consistent with the strong preference for arbitration in federal courts, waiver is not to be lightly inferred, and waiver will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." *Paine Webber Inc. v. Faragalli*, 61 F.3d 1063, 1068–69 (3d Cir. 1995).  To determine whether a party has waived its right to arbitrate, courts in this circuit consider six nonexclusive factors:  (a) "the timeliness or lack thereof of a motion to arbitrate"; (b) "the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims"; (c) "whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings"; (d) "the extent of its non-merits motion practice"; (e) "its assent to the district court's pretrial orders"; and (f) "the extent to which both parties have engaged in discovery."  *Nino v. Jewelry Exchange Inc.*, 609 F.3d 191, 208–09 (3d Cir. 2010) (citation omitted).  "[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct."  *Id.* at 209 (citation omitted).  Here, the factors ultimately favor 7-Eleven's argument.

a)  *7-Eleven's Motion to Stay the Arbitrable Claims Was Timely*

The plaintiffs filed their original complaint on April 12, 2018.  They argue, therefore, that 7-Eleven's motion to stay arbitrable claims—filed on September 20, 2018—was five months delayed.  This argument is unpersuasive.  Although the plaintiffs alluded to the fact that 7-Eleven was not getting the lowest prices for its recommended products in the background section of their original complaint, none of the claims in that original complaint referenced 7-Eleven's alleged failure to secure the lowest prices for its franchisees or the plaintiffs' inability to return unsold proprietary products.

Only when the plaintiffs filed the amended complaint on September 6, 2018, did they include an expanded breach of contract allegation. Three weeks later—on September 20, 2018—7-Eleven's counsel filed this motion to stay. Three weeks is not an undue delay. *See Nationwide Mut. Fire Ins. Co. v. Geo V. Hamilton, Inc.*, Civ. No. 08-646, 2010 U.S. Dist. LEXIS 35114, at *13–14 (W.D. Pa. Apr. 9, 2010), *aff'd*, 410 F. App'x 537 (holding that a party did not unduly delay in seeking arbitration when it sought to compel arbitration within two months of having arbitrable claims asserted against it).

### b) 7- Eleven Has Not Meaningfully Contested the Merits of the Arbitrable Claims in the Lawsuit

Although 7-Eleven filed a motion to dismiss the amended complaint, it stated that the plaintiffs' vendor negotiating practices claims are "not under consideration in this motion because they are to be resolved exclusively by arbitration." To date, 7-Eleven's only reference to the dismissal of the allegedly arbitrable claims on the merits can be found in a footnote in its supplemental briefing. It states that "[a] practical alternative to ruling on 7-Eleven's Motions to Stay is to dismiss Plaintiffs' 'lowest price' claims." The Court finds that 7-Eleven has not meaningfully contested the merits of the allegedly arbitrable claims in the litigation.

### c) 7-Eleven Advised the Plaintiffs that It Intended to Require Arbitration

As discussed in the related *Takiedine* case, the record shows that 7-Eleven advised Mr. Takiedine's counsel—who also represents the plaintiffs in this case—of its intention to seek arbitration before it formally filed its motion to stay similar, allegedly arbitrable claims, and the parties engaged in negotiations on this issue. *See* Memorandum at 14–15, *Takiedine v. 7-Eleven*, Civ. No. 17-4518 (E.D. Pa. February 22, 2019). Thus, the plaintiffs cannot argue that they did not know that 7-Eleven intended to require arbitration.

### d) 7-Eleven Has Not Filed Any Non-Merits Motions Concerning the Arbitrable Claims

7-Eleven has not filed any non-merits motions concerning the allegedly arbitrable claims.

### e) 7-Eleven Has Assented to Pre-Trial Orders but Has Always Maintained Its Right to Arbitrate

Although 7-Eleven has respected the Court's pretrial orders, including discovery orders relating to the allegedly arbitrable claims in the *Takiedine* case, 7-Eleven has always maintained its position that the vendor negotiating practices claims—including those concerning 7-Eleven's proprietary products—are subject to arbitration.

### f) Although Extensive Discovery Has Occurred, the Plaintiffs Have Not Been Prejudiced

Finally, the plaintiffs argue that 7-Eleven has waived its right to arbitration because extensive discovery has already taken place. However, at the time 7-Eleven filed its motion to stay, little discovery related to the allegedly arbitrable claims had taken place. Discovery related to non-arbitrable claims is not problematic. *Nationwide Mut. Fire Ins. Co.*, 2010 U.S. Dist. LEXIS 35114, at *21–22 ("No waiver of the right to arbitrate can occur from conducting discovery on non-arbitrable claims.") (citations omitted).

Moreover, most of the discovery on these issues has been pursued *by Mr. Takiedine* in his case, not by the plaintiffs here. To the extent the plaintiffs are arguing that they have been prejudiced by that discovery, the Court rejects this argument for the same reason it did so in *Takiedine*. Memorandum at 15–16, *Takiedine v. 7-Eleven*, Civ. No. 17-4518 (E.D. Pa. February 22, 2019). 7-Eleven reluctantly agreed to provide discovery materials related to these claims after Mr. Takiedine's counsel—who also represents the plaintiffs—filed several motions to compel and the Court ordered it. The plaintiffs will not be prejudiced in arbitration by having acquired discovery materials that their counsel relentlessly pursued in a related case.

For these reasons, the Court finds that 7-Eleven did not waive its right to arbitration.

2. *The Court Will Determine Which Claims Are Arbitrable*

7-Eleven's counsel originally admitted during oral argument that "the scope of the obligation to arbitrate is determined by the Court." However, in its supplemental briefing, 7-Eleven now argues that the scope of arbitration should be decided by an arbitrator, not the Court. 7-Eleven cites a recent decision by the Supreme Court for this proposition: *Henry Schein, Inc. v. Archer & White Sales, Inc.*, Civ. No. 17-1272, slip op. (Jan. 9, 2019).

However, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *IBEW v. Democratic Nat'l Comm.*, Civ. No. 17-1703, 2018 U.S. Dist. LEXIS 8624, at *13 (E.D. Pa. Jan. 19, 2018) (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986)). In the recent *Henry Schein* opinion, the Supreme Court re-affirmed this rule. Civ. No. 17-1272, slip op. (Jan. 9, 2019), at 6 ("[P]arties may delegate threshold arbitrability questions to the arbitrator, **so long as** the parties' agreement does so by 'clear and unmistakable' evidence.") (citation omitted) (emphasis added).

The agreement at issue in *Henry Schein* stated that arbitration would be conducted "in accordance with the arbitration rules of the American Arbitration Association." *Id.* at 2. The AAA's rules, in turn, provided that the arbitrator has the power to resolve arbitrability questions. 7-Eleven argues that *Henry Schein* requires the Court to refer the arbitrability question here to an arbitrator because, like in *Henry Schein*, the arbitration provision in the Franchise Agreements states that the arbitration is to be conducted pursuant to the "commercial arbitration rules of the American Arbitration Association." However, the *Henry Schein* Court "expressed no view about whether the contract at issue in [that] case in fact delegated the arbitrability question to an

arbitrator"; rather, it remanded the case so the court of appeals could decide that issue in the first instance. *Id.* at 8. Thus, *Henry Schein* does not go as far as 7-Eleven seeks to apply it.

The Third Circuit Court of Appeals has observed—without deciding—that the majority of circuits to have considered the issue have "determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016) (citations omitted). However, "this apparent consensus among the circuits is not as clear as it seems" because "nearly every circuit to have addressed the issue, save the Eighth Circuit in *Fallo v. High-Tech Institute*, 559 F.3d 874 (8th Cir. 2009), addressed the question in the context of arbitration agreements entered into by organizations, not unsophisticated individuals." *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 427 (E.D. Pa. Mar. 21, 2016) (citing cases). Recognizing this important distinction, a number of district courts in this circuit and elsewhere have concluded "that a cross-reference to a set of arbitration rules containing a provision that vests an arbitrator with the authority to determine his or her own jurisdiction does not automatically constitute clear and unmistakable evidence that the parties intended to arbitrate threshold questions of arbitrability—at least where those parties are unsophisticated." *Id.* at 428.

As the *Allstate* court explained "incorporating forty pages of arbitration rules into an arbitration clause is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take 'a good joke too far.'" *Id.* at 429 (citation omitted); *see also Richardson v. Coverall N. Am., Inc.*, Civ. No. 18-532, 2018 U.S. Dist. LEXIS 167240, at *10–11 (D.N.J. Sept. 27, 2018) (holding that a cross-reference to the AAA rules in a franchise agreement was not clear and unmistakable evidence that the parties delegated the issue of

arbitrability to the arbitrator); *Meadows v. Dickey's Barbecue Rests., Inc.*, 144 F. Supp. 3d 1069, 1078–79 (N.D. Cal. Nov. 12, 2015) (finding no clear and unmistakable evidence that franchisees intended an arbitrator to decide questions of arbitrability even though the AAA rules were incorporated in the arbitration provision because the franchisees were "far less sophisticated" than the franchisor-defendant).

7-Eleven cannot dispute that it is more sophisticated than the plaintiffs. There is certainly no reason to have any confidence that these parties actually addressed the question of arbitrability. To paraphrase Chief Justice John Marshall, the AAA's power to decide who decides may well be the power to guarantee its own continued existence as a profit-making enterprise. *See McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). At a minimum, the Court would look for some reason other than the AAA's own interest in expanding its own powers and time-logging activity before abdicating the responsibility for such a fundamental judicial function. In this context, the Court finds that the arbitration provision's reference to the AAA rules is not clear and unmistakable evidence of the parties' intent to delegate the arbitrability issue to an arbitrator. Thus, the Court itself will determine which of the plaintiffs' claims fall under the arbitration provision.

3. *The Plaintiffs' Vendor Negotiating Practices Claims—Including those Concerning 7-Eleven's Proprietary Products—Fall Within the Scope of the Arbitration Provision*

At the present time, the scope of an arbitration agreement should be decided "with a healthy regard for the federal policy favoring arbitration," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also AT&T Techs.*, 475 U.S. at 650. When arbitration clauses include terms such as "relating to," "arising from," or "arising out of," they are normally given broad construction. *See Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000).

Section 15(j) of the Franchise Agreements states that "in negotiating our contracts with Recommended Vendors and manufacturers (in either case 'Vendor') for products and services sold in 7-Eleven Stores, [7-Eleven] will take the following steps[,]" including to "make commercially reasonable effort to obtain the lowest cost for products and services available from such Vendor to 7-Eleven Stores on a Market Basis by identifying all available discounts, allowances and other opportunities for price adjustments."   Section 15(k) states that "the dispute resolution procedures set forth in Exhibit J are the exclusive procedures for resolving any disputes relating to or arising from our undertaking under Paragraph 15(j)(1) and (2)."

In turn, the "Dispute Resolution Procedures" set out in Exhibit J to the Franchise Agreements state that:

> **"ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO OUR OBLIGATIONS UNDER PARGRAPHS 15(j) AND (k) OR THE REVIEW CONDUCTED UNDER THIS EXHIBIT J WILL BE BARRED UNLESS AN ACTION IS COMMENCED UNDER THESE DISPUTE RESOLUTION PROCEDURES . . . ."**

Exhibit J further states that any claims arising from these paragraphs shall be submitted to non-binding, mandatory mediation.  If the non-binding mediation fails—as it did here—the claims shall be submitted to binding arbitration.

This arbitration provision clearly covers the plaintiffs' claim that 7-Eleven failed to "make a commercially reasonably effort to obtain the lowest cost for products and services," as the "commercially reasonable efforts" language comes straight out of Section 15(j).  But the plaintiffs also raise a related claim:  that 7-Eleven requires them to purchase and carry certain proprietary products in their stores, including "7-Select" products, and that they are not permitted to return these products in the event they go unsold.  Consequently, if the required merchandise goes unsold, the plaintiffs allege that they must take a loss in the form of a write-off.

7-Eleven argues that the plaintiffs' proprietary products claim is a "vendor negotiating practices" issue and should be arbitrated. Looked at with a neutral eye, Section 15(j)(1)(i) encompasses 7-Eleven's obligation to obtain any "discounts, allowance, or other opportunities for price adjustments" with 7-Eleven's "Vendors." The plaintiffs' proprietary products claim can be boiled down to this: they cannot return 7-Eleven's proprietary products to the vendors or manufactures when the products remain unsold like they can with other products, and they instead must take a loss. This is, in the final analysis, a vendor negotiating practices issue, as the plaintiffs are contending that return rights should exist—i.e., should have been negotiated by 7-Eleven with the vendors and manufacturers of the products at issue.

The plaintiffs attempt to avoid the arbitration provision in several ways. They first argue that "Vendors" as defined in Section 15(j)(1) does not include the various manufactures that 7-Eleven uses to produce its own proprietary product lines. Rather, they claim that the term "Vendor" only encompasses third-party recommended vendors with whom 7-Eleven deals at "arms-length." However, this argument is foreclosed by the language of Section 15(j)(1). Section 15(j)(1) states that "[i]n negotiating our contracts with Recommended Vendors **and manufacturers (in either case "Vendor")** for products and services sold in 7-Eleven Stores, [7-Eleven] will take the following steps . . . ." (emphasis added). "Vendor" is explicitly defined to include manufacturers other than "Recommended Vendors." Moreover, the provision references "products and services sold in 7-Eleven Stores" without excluding its own proprietary products. Given the breadth of the arbitration clause, which encompasses not only issues expressly mentioned, but also disputes "arising from or relating to" those identified issues, the plaintiffs' claims concerning 7-Eleven's proprietary products will also be submitted to arbitration. *Miron*, 342 F. Supp. 2d at 329 ("To overcome [the presumption of arbitrability] as applied to broad

arbitration agreements, a party must either establish the existence of an express provision excluding the grievance from arbitration or provide the most forceful evidence of a purpose to exclude the claim from arbitration.")  (citations omitted).

The plaintiffs next argue that the arbitration provision should not encompass claims concerning the "7-Select" proprietary product line because "7-Select" did not exist when they signed the Franchise Agreements.  However, the plaintiffs admit in the amended complaint that "[u]nder the terms of the Franchise Agreements, [7-Eleven] reserved the right to add or remove proprietary products to the list of proprietary products that Plaintiff[s] must sell in the store."  In light of this fact, and the fact that Section 15(j)(1) purports to generally cover all "products and services sold in 7-Eleven stores," the plaintiffs cannot now argue that claims concerning "7-Select" or other new proprietary products should be excluded from arbitration.

Finally, the plaintiffs argue that their claims concerning proprietary products arise from Section 15(b) of the Franchise Agreements, not Section 15(j), and thus, they should not be sent to arbitration.  Section 15(b) states that the plaintiffs agree to "carry at the Store all Categories of Inventory that we [7-Eleven] specify."  It further provides that the plaintiffs "may delete any Category if such Category does not meet sales goals that we [7-Eleven] establish, provided that you [the plaintiffs] obtain our prior written consent, which consent will not be unreasonably withheld."  However, this provision is not referenced anywhere in the amended complaint, and the plaintiffs do not allege that they asked 7-Eleven for permission to stop selling any products or that 7-Eleven unreasonably rejected such a request.  The plaintiffs cannot now re-cast their claim in an obvious effort to avoid arbitration.

For these reasons, the Court will stay the vendor negotiating practices claims—including the claim concerning 7-Eleven's proprietary products—pending the resolution by arbitration pursuant to Sections 15(j), 15(k), and Exhibit J to the Franchise Agreements.[8]

## III. The Plaintiffs' Additional Claims

### A. Unconscionability and Impracticability

In Count III of the Amended Complaint, the plaintiffs bring a claim for unconscionability. They allege that portions of the Franchise Agreements are procedurally unconscionable because they lacked a meaningful choice in accepting the provisions. They also allege that portions of the Franchise Agreements are substantively unconscionable because they unreasonably favor 7-Eleven by maximizing its profits while causing the plaintiffs' net profits to dwindle.

Similarly, in Count V of the amended complaint, the plaintiffs bring a claim for "Impracticability of Contract Provisions." They claim that at the time the Franchise Agreements were signed, they did not contemplate that the list of 7-Eleven proprietary products they would be required to sell would grow to such a large number. They further claim that 7-Eleven has required them to pay ever-increasing charges for maintenance and credit card transactions. These facts, the plaintiffs argue, frustrate the purpose of the Franchise Agreements, and they claim that they are entitled to damages and equitable relief.

However, under Pennsylvania law, unconscionability "is a 'defensive contractual remedy which serves to relieve a party from an unfair contract or from an unfair portion of a contract.'"

---

[8]    In its motion to stay, 7-Eleven notes that it only "seeks to stay the aspects of Plaintiffs' Amended Complaint that concern vendor negotiating practices." Moreover, the Court has discretion to allow non-arbitrable claims to proceed despite staying arbitrable claims when there is not a "substantial overlap" between the claims. *See e.g. Oliver v. Norstrom King of Prussia*, Civ. No. 10-5340, 2010 U.S. Dist. LEXIS 132124, at *17 (E.D. Pa. Dec. 14, 2010). Therefore, the remainder of this case will proceed ahead of or simultaneously with the arbitration of the vendor negotiating practices claims, if arbitration it is to be as to those claims.

*Harris v. Green Tree Fin. Corp*, 183 F.3d 173 (3d Cir. 1999) (quoting *Germantown Mfg. Co. v. Rawlinson*, 341 Pa. Super. 42, 55 (Pa. Super. 1985)). Pennsylvania law does not recognize a claim for unconscionability. *See Andrichyn v. TD Bank, N.A.*, 93 F. Supp. 3d 375, 389 (E.D. Pa. Mar. 19, 2015) ("As there is no precedent in . . . Pennsylvania allowing for an affirmative unconscionability claim, this claim must be dismissed."). Similarly, Pennsylvania law does not recognize a claim for impracticability. *See Angino v. BB&T Bank*, Civ. No. 15-2105, 2016 U.S. Dist. LEXIS 74801, at *30–31 (M.D. Pa. June 7, 2016) ("[T]hese types of affirmative defenses [including impracticability] under Pennsylvania law do not constitute an independent, free-standing legal claim.").

The plaintiffs do no cite—and the Court cannot find—any Pennsylvania cases allowing these types of claims to go forward. Rather, the cases the plaintiffs cite addressed unconscionability and impracticability in a defensive posture. *See Salley v. Option One Mortg. Corp.*, 592 Pa. 323, 331–32 (2007) (where the plaintiff argued that it could proceed in federal court because the arbitration agreement invoked by the defendant was unconscionable); *Step Plan Servs. v. Koresko*, 12 A.3d 401, 409 (Pa. Super. 2010) (where a party to a settlement agreement argued that it should not be required to perform due to impracticability, among other reasons); *Metalized Ceramics for Elecs., Inc. v. Natl Ammonia Co.*, 663 A.2d 762, 764 (Pa. Super. 1995) (where the plaintiff argued that a provision of the contract used by the defendant to defeat the plaintiff's breach of contract claim was unconscionable). In other words, they are to serve as shields, not swords.

For these reasons, the Court will dismiss the unconscionability and impracticability claims.

### B. Unjust Enrichment

In Count IV of the amended complaint, the plaintiffs bring a claim for unjust enrichment. They allege that despite paying advertising and maintenance charges to 7-Eleven on a regular

basis, they have not received the benefits from such payments. 7-Eleven, in turn, argues that the claim for unjust enrichment should be dismissed because the subject matter of this claim is governed by the Franchise Agreements. The Court will not dismiss the unjust enrichment claim at this time.

Under Pennsylvania law, to state a claim for unjust enrichment, "the plaintiff must allege 'benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value.'" *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, at 527 (E.D. Pa. Jan. 27, 2012) (quoting *Allegheny Gen. Hosp. v. Philip Morris*, 228 F.3d 429, 447 (3d. Cir. 2000)). Unjust enrichment is a "quasi-contractual doctrine that does not apply in cases where the parties have a written or express contract." *Id.* (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987)). Nevertheless, this Court has previously held that a "party may plead alternative theories of breach of contract and unjust enrichment when there is a dispute about the existence or validity of the contract in question." *Power Restoration Int'l, Inc. v. Pepsico, Inc.*, Civ. No. 12-1922, 2013 U.S. Dist. LEXIS 148016, at *20 (E.D. Pa. Oct. 11, 2013) (citations omitted).

In this case, although the plaintiffs admit that there is an express agreement between the parties, they also claim that portions of the Franchise Agreements are unconscionable and impracticable. Thus, at this stage of the proceeding, it is unclear whether the plaintiffs will pursue the breach of contract claim or challenge the validity of the Franchise Agreements and pursue the unjust enrichment claim. Accordingly, the Court will not dismiss the claim for unjust enrichment. *See id.* at *20 (declining to dismiss an unjust enrichment claim at the motion to dismiss stage

despite the existence of an agreement between the parties because it was unclear whether there would be a dispute as to the validity of the agreement). 7-Eleven may re-raise these arguments at a later stage in the proceeding, if appropriate.

### C. Conversion

In Count VI of the amended complaint, the plaintiffs bring a conversion claim. The plaintiffs allege that 7-Eleven has implemented a new accounting method, resulting in a decrease in their reported net profits, without apparent reason in some situations. They also claim that 7-Eleven has conducted inaccurate audits of their merchandise and wrongfully charged them for false shortfalls, depriving them of their full net profit without their consent. 7-Eleven argues that the conversion claim is barred by the gist of the action doctrine. The Court will not dismiss the conversion claim at this time.

The gist of the action doctrine "precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *Jones v. ABN AMRO Mortg. Group. Inc.*, 606 F.3d 119, 123 (3d Cir. 2010) (citation omitted). It forecloses tort claims: "1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 486 (Pa. Super. 2007) (citation omitted).

However, at the motion to dismiss stage, "a court should be slow to dismiss claims under the gist of the action doctrine" because "[f]ederal civil procedure allows parties to plead multiple claims as alternative theories of liability." *Orthovita, Inc. v. Erbe*, Civ. No. 07-2395, 2008 U.S. Dist. LEXIS 11088, at *12 (E.D. Pa. Feb. 14, 2008) (citation omitted). "Caution must be exercised

in dismissing a tort action on a motion to dismiss because whether tort and contract claims are separate and distinct can be a factually intensive inquiry." *Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.*, Civ. No. 11-4568, 2011 U.S. Dist. LEXIS 139980, at *22 (Dec. 6, 2011) (citations omitted); *see also Berger v. Montague v. Scott & Scott*, 153 F. Supp. 2d 750, 754 (E.D. Pa. 2001) (rejecting a challenge under the gist of the action doctrine and allowing a plaintiff to pursue claims for both breach of contract and conversion).

Under Pennsylvania law, conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 529 (E.D. Pa. 2012) (citations omitted). Courts have dismissed conversion claims under the gist of the action doctrine "where the alleged entitlement to the chattel arises solely from the contract between the parties." *Premier Payments Online, Inc.*, 848 F. Supp. 2d at 529 (citation omitted). However, "when a plaintiff has a property interest in the thing that is the subject of a conversion claim, the gist of the action doctrine does not bar recovery under a conversion theory even though the property may also be the subject of a contract." *Id.* (citations omitted).

Here, the plaintiffs' conversion claim is based on the fact that 7-Eleven has changed its accounting method, resulting in a decrease in their profits, and that 7-Eleven has conducted inaccurate audits of their merchandise and wrongfully charged them for false shortfalls. Although it is likely that the plaintiffs' claims arise solely from the contract between the parties, the Court declines to determine whether the gist of the action doctrine bars the conversion claim at this time. Accordingly, the Court will not dismiss the conversion claim. *See Kimberton*, 2011 U.S. Dist. LEXIS 139980 at *22–24.

### D. Fraud

Finally, in Count VII, the plaintiffs bring a claim for fraud. The fraud claim is also based on 7-Eleven's new accounting method, and the plaintiffs use the same exact language as employed in their conversion claim. The plaintiffs do, however, add one additional paragraph stating that "the erroneous accounting and inventory reports by Defendant to Plaintiff[s] constitute misrepresentations upon which Plaintiff[s] ha[ve] justifiably relied and caused Plaintiff[s] to incur economic damages as a result." 7-Eleven argues that the plaintiffs failed to plead the fraud claim with particularity as required by Fed. R. Civ. P. 9(b). For the reasons discussed herein, the Court agrees.

To plead fraud under Pennsylvania law, a plaintiff must allege: "(1) a representation which is (2) material to the transaction at hand, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, and (4) made with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance." *Shuker v. Smith & Nephew*, 885 F.3d 760, 778 (3d Cir. 2018) (citation omitted). "[T]hough 'intent . . . and other conditions of a person's mind may be alleged generally,' plaintiffs 'must state with particularity the circumstances constituting fraud.'" *Id.* (quoting Fed. R. Civ. P. 9(b)). To comply with Rule 9(b), a plaintiff "must allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation and must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it was charged." *Id.* (citations omitted).

The amended complaint falls short of this standard. First, although the plaintiffs conclusively state that "the erroneous accounting and inventory reports by Defendant to Plaintiff[s]

constitute misrepresentations upon which Plaintiff[s] ha[ve] justifiably relied," they fail to identify the alleged "misrepresentations" made by 7-Eleven with any particularity. The plaintiffs do not state which accounting and inventory reports were erroneous or what portions of these reports were fraudulent. Second, they fail to allege that these general misrepresentations were "material to the transaction at hand." Third, they do not allege that the erroneous reports were knowingly false or prepared recklessly without knowledge of their falsity. And finally, although intent may be averred generally, the plaintiffs do not allege any intent by 7-Eleven to defraud them whatsoever.

For these reasons, the Court will dismiss the fraud claim.

## IV. Mr. Chong's Individual Claims Will Be Dismissed Because He Has No Standing

Finally, 7-Eleven claims that Mr. Chong is not a party to, and only served as a guarantor to, the Franchise Agreements. Rather, 7-Eleven points out that only MT133123, Inc. is a party to the Franchise Agreements. Consequently, 7-Eleven argues that Mr. Chong has no standing to pursue his claims. The Court agrees.

The Third Circuit Court of Appeals has stated that it "is well established that, absent a direct individual injury, the president and principal shareholder of a corporation lacks standing to sue for an injury to the corporation." *Meade v. Kiddie Academy Domestic Fran., LLC*, 501 Fed. Appx. 106, 108 (3d Cir. 2012). Moreover, under Pennsylvania law, "a guarantor does not have standing to sue for breach of the contract to which he was not a party." *Walnut St. 2014-1 Issuer, LLC v. Pearlstein*, 2017 Pa. Super. Unpub. LEXIS 2400, at *26 (Pa. Super. 2017) (citing *Borough of Berwick v. Quandel Grp., Inc.*, 655 A.2d 606, 608 (Pa. Super. 1995)).

Here, Mr. Chong argues that he was personally injured by MT133123, Inc.'s dwindling profits. However, the rule that a president and principal shareholder of a corporation lacks standing to sue for an injury to the corporation applies "even though the plaintiff shareholder may have faced the risk of financial loss as a result of injuries to the corporation." *Meade*, 501 Fed. Appx.

at 108 (citing *Jones v. Niagara Frontier Transp. Authority*, 836 F.2d 731, 736 (2d Cir. 1987)). The plaintiffs cite no cases to the contrary.

Therefore, Mr. Chong's individual claims will be dismissed and only MT133123, Inc. will be permitted to proceed as a plaintiff in this case.

CONCLUSION

For the foregoing reasons, 7-Eleven's motion to dismiss is granted in part and denied in part, and 7-Eleven's motion to stay arbitrable claims is granted. An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE