# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY CHONG *et al.*, | : | CIVIL ACTION |
| *Plaintiffs* | : | |
| v. | : | |
| | : | |
| 7-ELEVEN, INC., | : | NO. 18-1542 |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                                                    MARCH 4, 2020

MT133132, Inc. ("MT") is a former 7-Eleven franchisee with two locations, Store 11336 and Store 33380. MT claims that during its time as a franchisee, 7-Eleven breached its duties under its Franchise Agreements by failing to treat MT as an independent contractor and failing to provide necessary maintenance to one of MT's stores. MT also claims that 7-Eleven breached the covenant of good faith and fair dealing by terminating MT's franchises in bad faith. 7-Eleven counterclaims against MT and its guarantor, Anthony Chong, for breach of contract and breach of guaranty because, 7-Eleven claims, MT allegedly underreported its merchandise sales. 7-Eleven now moves for summary judgment on all of MT's claims and on 7-Eleven's counterclaims.

For the reasons that follow, the Court grants 7-Eleven's motion for summary judgment in all respects.

### BACKGROUND AND PROCEDURAL HISTORY

Mr. Chong first undertook a 7-Eleven franchise in 1997 and continued to operate 7-Eleven franchises in Pennsylvania for 21 years. In 2004 he transferred ownership of his franchises to MT,

1

which Mr. Chong had incorporated.[1] Mr. Chong signed amended Franchise Agreements on behalf of MT in 2004 and 2008. In 2018, 7-Eleven terminated MT's Franchise Agreements after discovering that MT had allegedly inaccurately reported store transactions. MT claims that this allegation was pretext for terminating its Franchise Agreements and that 7-Eleven terminated the franchises in bad faith.

MT also claims that throughout its time as a franchisee, 7-Eleven failed to treat MT as an independent contractor as required under the Franchise Agreements. MT alleges that 7-Eleven forced MT to stock and sell certain products and that 7-Eleven employees interfered with MT's employees by pressuring them into doing what 7-Eleven wanted, presumably contrary to MT's interests and instructions. MT also claims that 7-Eleven failed to provide the necessary maintenance it promised under the Franchise Agreements when it ignored repeated requests for repairs to an HVAC system in one of MT's stores.

Originally, MT brought claims for breach of the covenant of good faith and fair dealing, breach of contract, unconscionability, unjust enrichment, impracticability, conversion, and fraud. 7-Eleven moved to dismiss and filed counterclaims against MT and Mr. Chong, alleging that they breached the Franchise Agreements by underreporting their merchandise sales to 7-Eleven. 7-Eleven also filed a motion to stay arbitrable claims, arguing that certain aspects of MT's breach of contract claims concerning vendor negotiating practices should be stayed for arbitration as required by the Franchise Agreements.

Following oral argument, the Court granted 7-Eleven's motion to stay the vendor negotiating practices claims for arbitration. It also dismissed two of MT's breach of contract

---

[1] Mr. Chong and MT were both named plaintiffs at the beginning of this case. However, the Court dismissed Mr. Chong's individual claims because he has no standing to assert the claims as fashioned. Only MT, as the franchisee, was permitted to proceed.

claims, as well as MT's impracticability, unconscionability, and fraud claims. Thereafter, the parties stipulated to the dismissal of several more of MT's claims.[2]

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely

---

[2] Specifically, the parties stipulated to the dismissal of MT's conversion claim and its breach of contract claims concerning credit card and advertising fees. And although the parties did not file a stipulation of dismissal concerning MT's unjust enrichment claim, MT agreed to the dismissal of that claim in its response to summary judgment.

3

disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

7-Eleven seeks (1) the dismissal of MT's breach of contract claims concerning 7-Eleven's alleged failure to (i) treat MT as an independent contractor and (ii) provide necessary maintenance to one of MT's stores; (2) the dismissal of MT's breach of the covenant of good faith and fair dealing claim; and (3) judgment against MT and Mr. Chong on 7-Eleven's counterclaims for breach of contract and breach of guaranty.

As explained in detail below, the Court grants 7-Eleven's motion because (1) Section 2 of the Franchise Agreements does not impose a duty on 7-Eleven, prohibit 7-Eleven from requiring MT to stock and sell certain products, or prohibit 7-Eleven from interacting with MT's employees; (2) there is no evidence in the record that 7-Eleven failed to make repairs that 7-Eleven deemed necessary; and (3) the record undisputedly shows that MT underreported its merchandise sales in violation of the Franchise Agreements.

### I. MT's Breach of Contract Claims

#### A. Failure to Treat MT as an Independent Contractor

MT alleges that 7-Eleven failed to treat it as an independent contractor as required under the Franchise Agreements by, "*inter alia,* forcing Plaintiff to sell products that [it] did not order

4

and interfering with Plaintiff's management of [its] staff and communicating directly to Plaintiff's staff in a harmful way." Am. Compl. ¶ 58. MT argues that this claim arises from Section 2 of the Franchise Agreements. Section 2 states:

> You [MT] and we [7-Eleven] agree that this Agreement creates an arm's-length business relationship and does not create any fiduciary, special or other similar relationship. You agree: (a) to hold yourself out to the public as an independent contractor; (b) to control the manner and means of the operation of the Store; and (c) to exercise complete control over and responsibility for all labor relations and the conduct of your agents and employees, including the day-to-day operations of the Store and all Store employees. You and your agents and employees may not: (i) be considered or held out to be our agents or employees or (ii) negotiate or enter any agreement or incur any liabilities in our name, on our behalf, or purporting to bind us or any of our or your successors-in-interest. Without in any way limiting the preceding statements, we do not exercise any discretion or control over your employment policies or employment decisions. All employees of the Store are solely your employees and you will control the manner and means of the operation of the Store. No actions you, your agents or employees take will be attributable to us or be considered to be actions obligating us.

Franchise Agreements § 2.

In response, 7-Eleven argues that the language of Section 2 does not impose any obligations on 7-Eleven. Rather, it claims that Section 2 only contains an acknowledgement by the parties that they have an arms-length business relationship and sets forth duties imposed on MT to conduct its business as an independent contractor.

MT claims that the doctrine of equitable estoppel prevents 7-Eleven from "enjoying the benefits of Plaintiff's independent contractor status, while simultaneously escaping its own obligations to treat Plaintiff as such when it suits it." Opp'n to Mot. for Summ. J. 14. MT also cites testimony from 7-Eleven's Market Manager Janice Tangradi and 7-Eleven's field consultant Matt Westiner, who both admitted during their depositions that 7-Eleven franchisees are independent contractors. Further, MT cites 7-Eleven's agreement with a third-party manufacturer

5

of its brand name products, which states that the manufacturer "acknowledges that 7-Eleven's franchisees are independent contractors who determine the manner and means of operating their own stores pursuant to the terms of the franchise agreements and arrangements related thereto." Counter-Statement of Material Facts Ex. C at § 5.02.

Section 2 does not impose a duty on 7-Eleven. First, the plain language of Section 2 ties all duties and obligations to MT, not 7-Eleven. Second, "[e]quitable estoppel is not a separate cause of action. It may be raised either as an affirmative defense or as grounds to prevent the defendant from raising a particular defense." *Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990). Therefore, if Section 2 of the Franchise Agreements does not impose an obligation on 7-Eleven, MT cannot invoke the doctrine of equitable estoppel to create one. And third, none of the evidence MT cites is material to whether Section 2 of the Franchise Agreements imposes the duties that MT seeks to enforce.

However, as next discussed, even if Section 2 did impose some duties on 7-Eleven, it cannot be invoked to prevent 7-Eleven from (1) requiring MT to stock and sell certain products, or (2) interacting with MT's employees.

*1. MT's Claim Concerning Merchandising*

There is no language in Section 2 that can be interpreted as preventing 7-Eleven from requiring its franchisees to stock and sell certain products. In fact, Section 2 does not even mention merchandising, i.e., the presence or absence of certain products, the placement of products within the store, or the quantity of those products. Merchandising is instead addressed in Sections 15(a)–(g) of the Franchise Agreements. For example, Section 15(c) requires that MT:

> [M]aintain in the Store at all times a Reasonable and Representative Quantity of all Proprietary Products listed in Exhibit G or otherwise in writing. We [7-Eleven] may change the Proprietary Products that

6

> you are required to offer from time to time upon reasonable notice . . . .[3]

Franchise Agreements § 15(c).

And Section 15(b) requires MT:

> [T]o carry at the Store all Categories of Inventory that we [7-Eleven] specify. You may delete any Category if such Category does not meet sales goals that we establish, provided that you obtain our prior written consent, which consent will not be unreasonably withheld. You agree to carry, use and offer for sale at the Store only the Inventory and other products that are consistent with the type, quantity, quality, and variety associated with the 7-Eleven Image and as we specify in the Agreement. You agree to comply with all of our standards and specifications for all Inventory, including Proprietary Products and other products and services carried, used or offered for sale at the Store.[4]

*Id.* at § 15(b).

These provisions are typical in Franchise Agreements and do not indicate that 7-Eleven controlled the day-to-day manner of MT's operations. *See, e.g., Myszkowski v. Penn Stroud Hotel*, 634 A.2d 622, 627 (Pa. Super. Ct. 1993) ("[T]he fact that Best Western sets certain standards in order to maintain a uniform quality of inn service only addresses the result of the work and not the *manner* in which it is conducted."); *see also Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 740

---

[3] MT highlights that only 11 products were listed as proprietary products in its Franchise Agreements and suggests that 7-Eleven's decision to add more proprietary products is a violation of the independent contractor provision. In support of this argument, MT claims that 7-Eleven makes a larger profit when its franchisees sell 7-Eleven branded products. However, Section 15(c) explicitly grants 7-Eleven the right to unilaterally modify the proprietary products list, and nothing prevents 7-Eleven from invoking its rights under its contracts to make a larger profit. There is no claim by MT invoking the "reasonable notice" language.

[4] MT notes that the "7-Select" product line was not listed as proprietary under Exhibit G and cites the testimony of the former Vice President of the Penn/Jersey Zone for 7-Eleven, Eric DeFrancisco, who admitted as much. *See* DeFrancisco Dep. 54:12–14. MT claims, therefore, that 7-Eleven cannot hide behind Section 15(c), and that its pressure on MT to sell "7-Select" products violated the independent contractor provision. However, MT ignores Section 15(b), in which it agreed to "carry at the Store all Categories of Inventory that [7-Eleven] specif[ied]." Franchise Agreements § 15(b). This provision is not limited to "proprietary products." MT's focus on the proprietary products designation is thus misplaced.

7

(Pa. 1977) ("It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product.").

Furthermore, interpreting Section 2 as preventing 7-Eleven from invoking its rights to require its franchisees to sell certain products would eviscerate Sections 15(a)–(g).[5] *See Lesko v. Frankford Hospital-Bucks County*, 15 A.3d 337, 342 (Pa. 2011) (explaining that courts should not "interpret one provision of a contract in a manner which results in another portion being annulled"); *see also Good Will Hunting Club, Inc. v. Range Res., Inc.*, No. 11-1152, 2012 WL 722614, at *3 (M.D. Pa. Mar. 1, 2012) ("[E]very agreement is made and to be construed with due regard to the known characteristics of the business to which it relates; and hence, the language used in a contract will be construed according to its purport in the particular business.") (quoting *Franklin Sugar Ref. Co. v. Howell*, 118 A. 109, 110 (Pa. 1922)).

Section 2 will not be interpreted as preventing 7-Eleven from requiring MT to stock and sell certain products.

*2. MT's Claim Concerning "Interference" With Its Employees*

MT also claims that 7-Eleven violated Section 2 of the Franchise Agreements by "interfering with Plaintiff's management of [its] staff and communicating directly to Plaintiff's staff in a harmful way." Am. Compl. ¶ 58. Thus, MT argues that 7-Eleven's field consultants told MT's store managers what to do and would "treat the employees of [the] store as if they were their employees." Dec. 11, 2018 Chong. Dep. 143:22–23. MT claims that the 7-Eleven field consultants put so much pressure on MT's employees that one of the employees resigned, another

---

[5] In addition to Sections 15(b) and 15(c), MT also claims that 7-Eleven breached Section 15(f), which relates to suggested retail pricing, and Section 15(g), which relates to recommended vendors. However, MT does not identify any facts or evidence in support of its conclusory allegation that 7-Eleven breached Section 15(f), and the Court previously dismissed MT's standalone claim under Section 15(g).

8

supposedly told Mr. Chong that a field consultant intimidated him, and MT's store managers felt intimidated generally. *See id.* at 56:24–57:2, 140:6–8, 144:4–18.

However, Section 2 merely states that 7-Eleven does not "exercise any discretion or control over [MT's] employment policies or employment decisions. All employees of the Store are solely [MT's] employees and [MT] will control the manner and means of the operation of the Store." Franchise Agreements § 2. Nothing in Section 2 prohibits 7-Eleven employees from interacting with or talking with franchisees' employees, and Mr. Chong's testimony does not demonstrate that 7-Eleven took "control" over MT's employees.[6]

Section 2 does not impose an obligation on 7-Eleven, prevent 7-Eleven from requiring MT to stock and sell certain products, or prevent 7-Eleven from interacting with MT's employees. Therefore, the Court grants 7-Eleven's motion for summary judgment on MT's "independent contractor" breach of contract claim.

## B. Failure to Provide Necessary Maintenance

Section 20(d) of the Franchise Agreements, which falls under "Maintenance and Utilities," provides in part that "[w]hen we [7-Eleven] consider it necessary during the Term of this Agreement, we agree to . . . (6) maintain the HVAC Equipment." Franchise Agreements § 20(d). MT claims that from 2004 through 2014, the HVAC system at Store 33380 did not work properly and caused temperatures to reach as high as 100 degrees. Dec. 11, 2018 Chong. Dep. 120:2–121:21. MT claims that 7-Eleven failed to make necessary repairs to the HVAC system despite repeated requests.

---

[6] Furthermore, Mr. Chong's testimony that an employee resigned because of the pressure from 7-Eleven field consultants is wholly speculative as to the employee's motive for resigning, or—if based on a statement of the employee—is hearsay. In that same vein, Mr. Chong's testimony that another employee said he was "intimidated" or that managers overall felt "intimidated" is (1) too vague and sweeping of an assertion to support a breach of Section 2, and (2) speculation as to the managers generally and hearsay as to the individual employee.

9

7-Eleven argues that summary judgment on this claim is warranted because MT cannot prove that 7-Eleven considered MT's requested repairs "necessary" as required under Section 20(d).[7] MT responds that 7-Eleven had a duty under Pennsylvania law to exercise its discretion in good faith to determine when a repair was "necessary." *See Ahearn v. Marsh & McLennan Companies, Inc.*, 124 F. App'x 118, 122 (3d Cir. 2005) ("Ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably."). MT asserts that its requested repairs were objectively necessary, and therefore 7-Eleven's failure to consider them necessary was in bad faith, breaching the contract.

However, in Pennsylvania, standards of good faith and fair dealing apply to franchise relationships "only in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee." *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1227 (Pa. 1981). Because neither the Pennsylvania Supreme Court nor the Third Circuit Court of Appeals has definitively held that the duty of good faith extends beyond actual franchise termination, district courts in Pennsylvania have traditionally declined to broaden the scope of the duty. *See Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 419 (W.D. Pa. 2005) ("In the absence of clear guidance from the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit, this Court declines to extend the scope of duty [beyond termination]."); *Keshock v. Carousel Sys., Inc.*, No. 04-758, 2005 WL 1198867, at *3 (E.D. Pa. May 17, 2005) ("Pennsylvania courts have never extended the franchisor's good faith duty beyond the context of termination.").

---

[7] 7-Eleven also claims that it maintained the HVAC system at Store 33380 by providing regular servicing and support according to the manufacturer's suggestions and providing repairs that 7-Eleven considered necessary to the system. Mihalkovitz Decl. ¶ 6. 7-Eleven further states that it paid to replace the HVAC system in June 2014 when it considered the replacement necessary. *Id.* at ¶ 10.

10

Here, MT does not claim that 7-Eleven failed to make repairs that 7-Eleven *subjectively* considered necessary. Rather, MT's sole argument is that 7-Eleven failed to make repairs that were *objectively* necessary, acting in bad faith and, in turn, breaching its duty to perform necessary maintenance. However, as just explained, neither the Supreme Court of Pennsylvania nor the Third Circuit Court of Appeals has extended a franchisor's duty to act in good faith beyond the context of terminating the relationship altogether. This Court will not do so here. Looking to the terms of the contract, the parties agreed that 7-Eleven would provide maintenance "[w]hen we [7-Eleven] consider it necessary during the Term of this Agreement." Franchise Agreements § 20(d). The evidence shows that 7-Eleven *did not* make repairs when it *did not* consider them necessary (even if MT did), and 7-Eleven *did* make repairs when it *did* consider them necessary. That is all the contract demanded of 7-Eleven. The discretion to undertake such repair work resided in 7-Eleven alone. Because MT has not identified evidence that 7-Eleven failed to provide maintenance that 7-Eleven considered necessary, there is no dispute of material fact as to whether 7-Eleven breached a duty under Section 20(d) of the Service Agreements.[8]

For these reasons, the Court grants 7-Eleven's motion for summary judgment on MT's "necessary maintenance" claim.

## II. MT's Breach of the Covenant of Good Faith and Fair Dealing Claim

MT alleges that its franchises were wrongfully terminated and that 7-Eleven "issued bad faith inspection reports and letters of notification as a pretext for terminating" its franchises. Am. Compl. ¶ 50. 7-Eleven moves for summary judgment on this claim, arguing that it acted in

---

[8] Even if the duty of good faith and fair dealing applied, MT cannot use the duty to limit 7-Eleven's "unfettered discretion" where reading the duty into Section 20(d) would "contradict the express terms of the contract, which provide that [7-Eleven] is the relevant decisionmaker . . . [a]nd these terms impose no constraint on [7-Eleven]'s discretion." *Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 586 (W.D. Pa. 2017), *recons. denied*, No. 16-42, 2018 WL 816844, at *3 (W.D. Pa. Feb. 9, 2018), *aff'd*, 753 F. App'x 124 (3d Cir. 2018).

accordance with its express rights under the Franchise Agreements when it terminated MT's franchises for underreporting its merchandise sales.

## A. The Relevant Law

Pennsylvania courts have recognized that "a franchise agreement imposes a duty upon franchisors not to act arbitrarily in terminating the franchise agreement." *Razumic*, 390 A.2d at 742. Thus, "a franchise relationship may be terminated by the franchisor only when consistent with '[the franchisee's] reasonable expectations, principles of good faith and commercial reasonableness,' or where the termination is specifically provided for by the contract." *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 555 (E.D. Pa. 2008) (quoting *Razumic*, 390 A.2d at 743); *see also Dunkin' Donuts Inc. v. Guang Chyi Liu*, 79 F. App'x 543, 547 (3d Cir. 2003) ("A franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated.") (citation and quotations omitted); *Amoco Oil Co. v. Burns*, 437 A.2d 381, 384 (Pa. 1981) ("The duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise *only when it is not explicitly described in the parties' written agreements*.") (emphasis added).

## B. Relevant 7-Eleven Accounting Procedures and Contract Terms

Franchisees are required to pay a royalty to 7-Eleven called the "7-Eleven Charge," which is a percentage of a franchisee's gross profit. Franchise Agreements § 10. The 7-Eleven Charge differed slightly for each of MT's two stores: a 50% charge applied to Store 33380, and a charge ranging between 51% and 52% applied to Store 11336. Newman Decl. ¶¶ 34–35.[9]

---

[9] Wade Newman is a retired 7-Eleven employee who worked for 37 years in accounting and financial roles. Mr. Newman provided descriptions of 7-Eleven's accounting procedures and MT's alleged accounting issues.

12

The Franchise Agreements also impose two security requirements on a franchisee: (1) the franchisee's receipts must be deposited on a daily basis into a bank account controlled by 7-Eleven; and (2) the franchisee must maintain a "Minimum Net Worth" of $15,000. Franchise Agreements § 13(a)–(d).

Finally, franchisees are required to prepare and transmit a daily "Cash Report" to 7-Eleven. Newman Decl. ¶ 9. The Cash Report is the principal means of transmitting store-level transaction information to 7-Eleven and, among other things, sets forth a store's daily sales.

If a franchisee's Net Worth falls below the minimum, it can increase its Net Worth by making an equity payment, which is referred to as a "paid-in-capital contribution." Paid-in-capital contributions are deposited with the rest of the store's receipts into the bank account controlled by 7-Eleven. *Id.* at ¶ 13. To make a paid-in-capital contribution, a franchisee first uses the point-of-sale register at the sales counter to record (or "ring up") an equity payment as a store transaction. This causes the paid-in-capital amount to be included as part of the store's daily receipts. *Id.* at ¶ 14. Then, when the store's daily receipts are reported to 7-Eleven by the Cash Report, the franchisee designates that a paid-in-capital contribution has occurred by entering its amount in the electronic field for paid-in-capital. *Id.* at ¶ 15. Entering the equity payment on the Cash Report informs 7-Eleven that a specific portion of the store's daily receipts include a paid-in-capital contribution and its amount. 7-Eleven then uses that information to calculate the store's account balance and Net Worth. *Id.* at ¶ 16.

If the amount of the paid-in-capital contribution is overstated in the Cash Report, the daily merchandise sales receipts of the store as reported to 7-Eleven are understated by the difference between the amount entered by the franchisee on the Cash Report and the lesser amount, if any, rung as a paid-in-capital contribution on the point-of-sale register.

13

In relation to these accounting procedures, the Franchise Agreements (1) require a franchisee to properly prepare and submit to 7-Eleven the "Cash Report," daily summaries of inventory purchases, receipts, and actual sales data; and (2) contain a franchisee's promises that the information it provides to 7-Eleven will "be truthful, accurate, complete, and in compliance with 7-Eleven's policies." Franchise Agreements §§ 12(b)(1), 12(c)(1), 12(c)(3). Section 26(a) of the Franchise Agreements gives 7-Eleven the right to terminate the Franchise Agreements if the franchisee does not "properly record, deposit, deliver, or expend and report Receipts or deliver deposit slips, cash reports, and all supporting documents, receipts for cash Purchases, and invoices or other reports of Purchases as required by Paragraph 12." *Id.* at § 26(a)(4)(b).

## C. MT's Alleged Breach of its Accounting Duties

7-Eleven claims that, on many occasions between January 2013 and January 2018, MT represented on its Cash Report that the receipts for Store 33380 included a paid-in-capital contribution. Newman Decl. ¶ 21. The total value amount of paid-in-capital contributions claimed by MT for this time period was $221,644.69. *Id.* However, during this same span, MT only rang a total of $31,720.61 on Store 33380's point-of-sale register as paid-in-capital contributions.[10] *Id.* The difference—$184,924.08—is underreported merchandise sales of which 7-Eleven was denied its share of the profits. *Id.* 7-Eleven alleges that MT committed similar accounting misconduct at Store 11336, resulting in $181,309.04 in underreported merchandise sales.[11] *Id.* at ¶ 23.

---

[10] For example, in September 2017, on 13 different occasions, MT claimed a $250 paid-in-capital contribution for Store 33380 in its Cash Report. Newman Decl. ¶ 26. The point-of-sale register data, however, shows that there were no paid-in-capital amounts rung on the register in September 2017. *Id.*

[11] 7-Eleven also accuses MT of additional accounting manipulations. Mr. Newman explains that the underreported merchandise sales caused by the paid-in-capital misrepresentations should have been exhibited by inventory shortages in MT's books of at least the amount of the underreported merchandise sales. *Id.* at ¶ 32. However, Mr. Newman claims that MT's stores routinely had annual inventory shortages that were far less than the amount of its underreported sales, and in some cases, had inventory overages. *Id.* at ¶ 33. For example, in calendar year 2016, MT's "paid-in-capital scheme" allegedly resulted in

14

Accounting for the costs of goods sold for the underreported merchandise sales, "but for the false reporting of paid-in-capital contributions," the 7-Eleven Charge for Store 11336 would have been at least $90,682.93 more, and the 7-Eleven Charge for Store 33380 would have been at least $86,127.22 more. *Id.* at ¶ 37.

### D. 7-Eleven Terminates MT's Franchises

On January 19, 2018, 7-Eleven sent MT a "Notice of Material Breach" of the Franchise Agreements describing MT's alleged paid-in-capital misreporting "scheme" and demanding payment of the unpaid portion of the 7-Eleven Charge as a cure. *See* Tangradi Decl. Ex. A. 7-Eleven also demanded that MT submit to an audit of its stores and pay the appropriate taxing authorities the tax due for any sales that were underreported. *Id.* 7-Eleven gave MT three business days to meet its demands. In the alternative, 7-Eleven offered MT additional time to cure its alleged breach if it agreed to a "Forbearance Agreement," which would have imposed additional terms on MT. *Id.*

For several weeks, 7-Eleven and MT attempted to negotiate a forbearance agreement. While the negotiations were ongoing, MT and Mr. Chong filed the present lawsuit. Tangradi Decl. ¶ 13. The parties engaged in one more attempt to negotiate on April 13, 2018, but MT rejected 7-Eleven's offer. *Id.* at ¶ 14. Thereafter, on April 25, 2018, 7-Eleven gave MT written notice that its Franchise Agreements would be terminated effective April 27, 2018. *Id.* at Ex. B.

---

$36,500 in unreported merchandise sales at Store 11336. *Id.* Therefore, audits should have identified an aggregate merchandise inventory shortage of at least the cost value of $36,500 in retail merchandise sales. *Id.* Instead, there was a yearly inventory *overage* of $7,064.68. *Id.* Mr. Newman claims that he found similar inventory overages throughout each of the years and believes that "such persistent inventory overages are not possible absent a substantial, concerted effort to conceal shortages through unreported inventory purchases or like conduct to manipulate inventory value." *Id.*

15

**E. Analysis**

Based on this record, 7-Eleven properly terminated the Franchise Agreements. MT does not dispute that Section 26(a) of the Franchise Agreements gave 7-Eleven the right to terminate if MT inaccurately reported its financials. And Mr. Newman's declaration, which is based on financial documentation, clearly shows that MT overreported its paid-in-capital contributions, and thereby underreported its merchandise sales and gross profits. Therefore, 7-Eleven had the right to terminate the Franchise Agreements, and such termination cannot form the basis of MT's breach of the covenant of good faith and fair dealing claim. *See Dunkin' Donuts Inc.*, 79 F. App'x at 547 ("A franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated."); *Amoco Oil Co.*, 437 A.2d at 384 ("The duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise *only when it is not explicitly described in the parties' written agreements*.") (emphasis added).[12]

MT argues that summary judgment against it should be denied because 7-Eleven has not clearly established the existence of MT's breach. MT points to Mr. Newman's deposition testimony and claims that Mr. Newman "admitted under oath" that 7-Eleven only has a "suggestion" of an attempt by defendant to defraud 7-Eleven. Opp'n to Mot. for Summ. J. 11. MT also highlights that Mr. Newman admitted that the alleged "theft" was never "witnessed," and

---

[12] Even if an implied duty of good faith applied here, MT cannot establish that 7-Eleven acted in bad faith. Under established law, 7-Eleven did not need to give MT an opportunity to cure its breach related to underreported revenue. *See LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 644 (Pa. 2009) (upholding immediate termination where franchisee purposely underreported revenue to avoid paying royalties despite contract provision that contemplated cure period). Nevertheless, the record shows that 7-Eleven worked with MT for months prior to terminating its stores. This conduct shows that 7-Eleven was acting in good faith. *See Witmer*, 394 A.2d at 1286 (observing that Exxon exhibited "good faith" in attempting to negotiate with tenant-franchisees and treating them as holdover tenants instead of promptly evicting them as would have been its right), *aff'd* 434 A.2d 1222 (Pa. 1981).

that it is possible that that audits of MT's stores were inaccurate, which could explain the cash reporting discrepancies and alleged fraud. *Id.*

However, MT mischaracterizes Mr. Newman's testimony. For example, Mr. Newman may have used the word "suggest," but when read in full, Mr. Newman's testimony does not cast doubt on the fact that MT had underreported its merchandise sales: "We have inconsistencies that suggest a purposeful attempt to fraud. We have an action that benefits the franchisee financially from doing it; in other words, there's motive for doing it. And all of that leads us to develop the financial model that quantifies the activity and also the impact to 7-Eleven." Newman Dep. 78:2–8. Similarly, Mr. Newman may have admitted that he never witnessed the fraud in one of MT's stores firsthand, but he qualified this statement and explained that he could nonetheless "see in the financial records that it occurred." *Id.* at 83:1–7. And although Mr. Newman may have admitted that "it's possible" that 7-Eleven's financial audits were "inaccurate," he also qualified this statement by explaining that it was "highly unlikely." *Id.* at 90:7–12. Unlike MT would have the Court believe, Mr. Newman does not cast doubt on the existence of the underreporting.

MT also insinuates that 7-Eleven used its underreporting as a pretext for terminating its franchises, and that 7-Eleven really had a nefarious motive—clearing the way for new, more lucrative franchisees. MT highlights that 7-Eleven claims that MT's alleged fraudulent practices were going on for five years and accuses 7-Eleven of "waiting" until 2018 to bring the issue to MT's attention. Opp'n to Mot. for Summ. J. 8. However, there is no evidence in the record suggesting that 7-Eleven knew about MT's practices for years and did nothing. And even if there was evidence that 7-Eleven had known about MT's conduct beforehand and only terminated the franchises in 2018 because of an ulterior motive, the Third Circuit Court of Appeals has held that, "as a matter of law, [a franchisee's] material breach of the Franchise Agreement trigger[s] [the
17

franchisor's] right to terminate the Agreement, rendering any ulterior financial motive irrelevant." *Dunkin' Donuts Inc.*, 79 F. App'x at 547.

For these reasons, the Court grants 7-Eleven's motion for summary judgment on MT's breach of the covenant of good faith and fair dealing claim against 7-Eleven.

## III.   7-Eleven's Counterclaims

Based on this same underreporting of merchandise sales, 7-Eleven filed counterclaims for breach of contract and breach of guaranty against MT and Mr. Chong, and now asks the Court for judgment in its favor.

### A. Breach of Contract

In Counts I and II, 7-Eleven brings counterclaims for breach of contract against MT arising, respectively, from MT's breach of the Store 11336 Franchise Agreement and breach of the Store 33380 Franchise Agreement. As discussed above, 7-Eleven presented undisputed evidence that MT breached its reporting obligations under the Franchise Agreements, and that, as a result, 7-Eleven was deprived of a portion of its share of MT's profits. Based on this undisputed evidence, the Court grants 7-Eleven's motion for summary judgment on its breach of contract claims.[13]

Mr. Newman conducted detailed calculations and determined that the unpaid 7-Eleven Charge for Store 11336 is at least $90,682.93 and the unpaid 7-Eleven Charge for Store 33380 is at least $86,127.22. However, as Mr. Newman admitted, MT is due a setoff of $3,551.22 for Store

---

[13] In response to 7-Eleven's counterclaims, MT and Mr. Chong rely entirely on the arguments MT made in support of its breach of the covenant of good faith and fair dealing claim, stating that "there are clear issues of genuine disputed facts surrounding [MT's] termination—and Defendant's counterclaim— that require a jury to resolve." Opp'n to Mot. for Summ. J. 11. However, as discussed above, MT failed to create a genuine dispute of fact.

18

11336 and $13,692.15 for Store 33380.[14] Therefore, 7-Eleven is entitled to $87,131.71 for Store 11336 and $72,435.07 for Store 33380, for a total of $159,566.78.[15]

**B. Breach of Guaranty**

In Count III, 7-Eleven brings a breach of guaranty claim against Mr. Chong in his individual capacity. "An action seeking recovery under a guaranty is essentially a breach of contract action," and the elements are the same. *U.S. Bank, N.A. v. Gorman*, No. 11-612, 2012 WL 2919295, at *4 (W.D. Pa. June 7, 2012), *report and recommendation adopted*, 2012 WL 2916721 (W.D. Pa. July 14, 2012). In connection with the Franchise Agreements, Mr. Chong signed written guaranties. *See* Principals' Guaranty and Assumption Agreements. In relevant part, the guaranties provide that Mr. Chong promises "the full and prompt payment when due of any and all indebtedness and liabilities, and the full and prompt performance of all obligations, of every nature and kind, of Franchisee under the Franchise Agreement." *Id.* Therefore, because the Court grants 7-Eleven's motion for summary judgment as to its breach of contract claims, it also grants 7-Eleven's motion for summary judgment as to its breach of guaranty claim. The resultant damages are the same (and can be collected only once, of course).

## CONCLUSION

For the foregoing reasons, 7-Eleven's motion for summary judgment is granted. An appropriate order follows.

BY THE COURT:

*/s/ Gene E.K. Pratter*

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[14] The setoffs are related to fees MT paid during the termination of its stores.

[15] MT and Mr. Chong do not challenge Mr. Newman's calculation of damages.

19