## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY CHONG *et al.*, | : | |
| *Plaintiffs* | : | CIVIL ACTION |
| v. | : | |
| | : | |
| 7-ELEVEN, INC, | : | No.  18-1542 |
| *Defendant* | : | |

### MEMORANDUM

PRATTER, J.                                                           SEPTEMBER _2_ , 2020

MT133132, Inc. ("MT") and Anthony Chong[1] seek reconsideration of the Court's granting of 7-Eleven, Inc.'s motion for summary judgment on MT's claims and 7-Eleven's counterclaims. 7-Eleven opposes the motion.

For the reasons that follow, the Court denies the motion for reconsideration.[2]

### BACKGROUND AND PROCEDURAL HISTORY

Former 7-Eleven franchisee MT initially filed a complaint against 7-Eleven alleging breach of the covenant of good faith and fair dealing, breach of contract, unconscionability, unjust enrichment, impracticability, conversion, and fraud.  7-Eleven moved to dismiss the complaint, filed counterclaims against MT and Mr. Chong alleging that they had breached the Franchise Agreements by underreporting sales, and filed a separate motion to stay arbitrable claims, arguing that some of MT's breach of contract claims concerning vendor negotiating practices needed to be arbitrated under the terms of the Franchise Agreements.

---

[1]     Anthony Chong was a named plaintiff at the beginning of this case, but the Court dismissed Mr. Chong's individual claims for lack of standing.  However, Mr. Chong remained in the case as a counter-defendant to 7-Eleven's counterclaims.

[2]     In a related case brought by another former franchisee, the Court recently issued a separate memorandum and order addressing a similar motion for reconsideration, as well as a motion for leave to amend the complaint. *See Takiedine v. 7-Eleven, Inc.*, Civ. No. 17-4518.

After holding oral argument on the motions, the Court granted 7-Eleven's motion to stay arbitrable claims, ruling that MT's vendor negotiating practices claims under Section 15 of the Franchise Agreements, including those concerning 7-Eleven's proprietary products, fell within the scope of the Franchise Agreements' arbitration provision. The Court also dismissed two of MT's breach of contract claims concerning (1) fair and accurate merchandise audits under Section 14 of the Franchise Agreements; and (2) recommended vendors under Section 15(g). Four of MT's breach of contract claims survived, namely, those relating to (1) failure to provide necessary maintenance under Section 20(d); (2) failure to treat MT as an independent contractor under Section 2; (3) failure to provide advertising reports under Section 22; and (4) no written notice of credit card fees and the increase of said fees under Section 7 of the Credit Card Amendment to the Franchise Agreements. MT's impracticability, unconscionability, and fraud claims were dismissed, and the parties subsequently stipulated to the dismissal of MT's conversion claim and breach of contract claims related to credit card and advertising fees.

7-Eleven then moved for summary judgment on MT's remaining claims and 7-Eleven's counterclaims.[3] Following oral argument, the Court granted the motion in its entirety. In dismissing MT's independent contractor claim, the Court held that Section 2 of the Franchise Agreements did not impose a duty on 7-Eleven, and even if such a duty did exist, Section 2 did not prohibit 7-Eleven from requiring MT to stock and sell certain products or from interacting with MT's employees, both of which matters were the gravamen of MT's claims. The Court also held that 7-Eleven could not be liable for failure to provide necessary maintenance under Section 20(d) because, under Pennsylvania law, the standards of good faith and fair dealing apply to franchise relationships only in the context of termination of the agreement, and there was no allegation that

---

[3]     MT agreed to the dismissal of its unjust enrichment claim in its response to the summary judgment motion.

7-Eleven had failed to make repairs it deemed subjectively (as it contractually was permitted to do so) necessary as required by the Franchise Agreements. The Court dismissed MT's breach of the covenant of good faith and fair dealing claim on the grounds that the evidence showed MT had inaccurately reported its financials, giving 7-Eleven the right to terminate the Franchise Agreements. Because 7-Eleven had presented undisputed evidence that MT breached its reporting obligations, the Court also granted 7-Eleven's counterclaims for breach of contract and breach of guaranty.

## LEGAL STANDARD

To succeed on a motion for reconsideration under Federal Rule of Civil Procedure 59(e), the moving party "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law [or fact] or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (per curiam); *accord Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Although Rue 60(b)(6) permits a court to also "grant relief from a final judgment for 'any other reason that justifies relief,'" courts have adopted a qualitative expectation that a party seeking Rule 60(b)(6) relief "demonstrate the existence of 'extraordinary circumstances' that justify reopening the judgment." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 255 (3d Cir. 2008) (citations omitted).

Accordingly, "[d]isagreement with the Court's ruling is not proper grounds for a motion for reconsideration." *Smith v. Unilife Corp.*, No. 13-5101, 2015 WL 115581, at *1 (E.D. Pa. Jan. 7, 2015). Furthermore, "a motion for reconsideration is not an opportunity for a party to present previously available evidence or new arguments." *Federico v. Charterers Mut. Assur. Ass'n Ltd.*, 158 F. Supp. 2d 565, 578 (E.D. Pa. 2001) (quoting *F.D.I.C. v. Parkway Exec. Office Ctr.*, No. 96-121, 1997 WL 611674, at *1 (E.D. Pa. Sept. 24, 1997)); *see also Romero v. Allstate Ins. Co.*, 170 F. Supp. 3d 779, 783 (E.D. Pa. 2016) ("Motions for reconsideration may not be used 'as a means

3

to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.'") (quoting *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990)).

"Because federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly." *Douris v. Schweiker*, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002) (quoting *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937, 943 (E.D. Pa. 1995)); *see also Johnson v. BB & T Corp.*, No. 17-4490, 2018 WL 1518618, at *2 (E.D. Pa. Mar. 28, 2018) ("Third Circuit law is fairly clear that motions for reconsideration . . . are to be granted sparingly because of the interests in finality and conservation of scarce judicial resources.") (citations and internal quotation marks omitted). Indeed, a district court "should be loathe" to revisit its prior decision unless "extraordinary circumstances" are present, "such as where the initial decision was clearly erroneous and would make a manifest injustice." *Lesende v. Borrero*, 752 F.3d 324, 339 (3d Cir. 2014) (citing *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009)).

## DISCUSSION

MT and Mr. Chong seek reconsideration of the Court's decision granting 7-Eleven's motion for summary judgment. They assert three grounds in support of the motion: (1) that the Court based its decision in part on the erroneous belief that "7-Select" was a "Category of Inventory" under the Franchise Agreements; (2) that there is sufficient evidence from which a reasonable jury could conclude that 7-Eleven breached the Franchise Agreements by requiring MT to carry "7-Select" products; and (3) that there are open issues of fact on the matter of 7-Eleven's counterclaims that must go to a jury.

## I.     Categories of Inventory

MT asserts that the Court based its summary judgment decision in part on the belief that "7-Select" was a "Category of Inventory" that MT was required to sell under Section 15(b) of the

4

Franchise Agreements.  MT argues that this conclusion was in error because "7-Select" is not a Category of Inventory, and therefore Section 15(b) cannot justify 7-Eleven requiring MT to carry "7-Select."

In the first place, the Court's summary judgment decision turned on Section 2, not Section 15.  The Court held outright that Section 2 did not impose a duty on 7-Eleven, at which point the fate of MT's independent contractor claim was sealed.  However, in executing a comprehensive analysis, the Court then explored whether "*even if* Section 2 did impose some duties on 7-Eleven," Section 2 could "be invoked to prevent 7-Eleven from [] requiring MT to stock and sell certain products."  Mar. 4, 2020 Mem. 6 (Doc. No. 84) (emphasis added).  The Court concluded it could not.  Accordingly, even if MT's arguments that the Court erred in its merchandising evaluation had merit, reconsideration would not be warranted because the merchandising evaluation was inconsequential to the Court's principal determination that Section 2 did not impose any duties on 7-Eleven.  *See Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 17 F. Supp. 3d 539, 544 (E.D. Va.) ("[N]either of these factual quibbles raised by PMC can serve as a basis for reconsideration of the summary judgment, as neither is material to the disposition of the summary judgment motion."), *aff'd*, 584 F. App'x 121 (4th Cir. 2014).

Even so, MT's arguments do not have merit.  In granting 7-Eleven's motion for summary judgment on MT's independent contractor claim arising under Section 2, the Court stated in a footnote:

> MT notes that the "7-Select" product line was not listed as proprietary under Exhibit G and cites the testimony of the former Vice President of the Penn/Jersey Zone for 7-Eleven, Eric DeFrancisco, who admitted as much. *See* DeFrancisco Dep. 54:12-14. MT claims, therefore, that 7-Eleven cannot hide behind Section 15(c), and that its pressure on MT to sell "7-Select" products violated the independent contractor provision. However, MT ignores Section 15(b), in which it agreed to "carry at the Store all Categories of Inventory that [7-Eleven] specif[ied]." Franchise Agreements § 15(b). This provision is not limited to "proprietary products." Thus, MT's focus on the proprietary products designation is misplaced.

Mar. 4, 2020 Mem. 7 n.4 (Doc. No. 84).

Despite MT's contentions to the contrary, the Court did not hold that "7-Select" was a Category of Inventory. Rather, the Court's reference to Section 15(b) served to illustrate the considerable discretion contractually held by 7-Eleven. Indeed, beyond granting 7-Eleven the discretion to specify Categories of Inventory, Section 15(b) also required MT to "agree to comply with *all* our [7-Eleven] standards and specifications for *all* Inventory, *including Proprietary Products and other products and services carried, used or offered for sale* at the Store." Franchise Agreements § 15(b) (emphasis added).

MT also neglects the reference to Section 15(c) in the Court's decision, which further emphasized 7-Eleven's discretion:

> MT highlights that only 11 products were listed as proprietary products in the Franchise Agreements and suggests that 7-Eleven's decision to add more proprietary products is a violation of the independent contractor provision. In support of this argument, MT claims that 7-Eleven makes a larger profit when its franchisees sell 7-Eleven branded products. *However, Section 15(c) explicitly grants 7-Eleven the right to unilaterally modify the proprietary products list, and nothing prevents 7-Eleven from invoking its rights under its contracts to make a larger profit.* There is no claim by MT invoking the "reasonable notice" language.

Mar. 4, 2020 Mem. 7 n.3 (Doc. No. 84) (emphasis added).

No matter which way MT tries to manipulate the Court's words, the Court's reference to Section 15(b), in a footnote, after ruling that Section 2 did not impose any duties on 7-Eleven, was inconsequential to the outcome and is not a proper basis for reconsideration.

**II.    Sufficient Evidence**

Next, MT claims that the evidence weighs in its favor and a reasonable jury could find that 7-Eleven breached the Franchise Agreement by forcing it to sell "7-Select" products. MT also purports to have newly discovered evidence in the form of affidavits from three of its former managers. Both of these arguments fail.

6

### A.   Evidence That 7-Eleven Forced MT to Stock Unrequired Merchandise

Most notably, none of the arguments MT raises regarding the sufficiency of the evidence relate to the Court's central holding that Section 2 did not impose any duties on 7-Eleven. Therefore, MT's contentions and evidence are, simply, immaterial to the Court's ultimate decision and cannot be grounds for reconsideration.

Furthermore, MT's evidentiary arguments are largely recycled from its summary judgment briefing and, as the Court previously held, do not identify a dispute of material fact. Under Section 15(c) of the Franchise Agreements, MT agreed to maintain in its stores a reasonable quantity of proprietary products as listed in Exhibit G to the Franchise Agreements or as otherwise specified by 7-Eleven in writing. Section 15(c) permitted 7-Eleven to change the proprietary products "from time to time upon reasonable notice (delivered in electronic or other form) . . . by unilaterally modifying Exhibit G or by otherwise providing . . . written notice of the change." MT does not claim that that 7-Eleven failed to provide such notice. Rather, MT relies on the absence of "7-Select" from Exhibit G and argues that the number of proprietary products it was forced to sell greatly increased beyond what was contemplated at the time the Franchise Agreements were signed.[4] But under Section 15(c), Exhibit G is not MT's life preserver. MT agreed to "maintain in the store at all times a Reasonable and representative Quantity of all Proprietary Products listed in Exhibit G *or otherwise in writing*," Franchise Exhibits § 15(c) (emphasis added), and Section

---

[4]     Accordingly, because an item could be added to the list of proprietary products without requiring a modification of Exhibit G, MT's contention that the "7-Select" product line was not listed as proprietary under Exhibit G and its reliance on the testimony of the former Vice President of the Penn/Jersey Zone for 7-Eleven, Eric DeFrancisco, admitting the same do not demonstrate a violation of Section 15(c).

    Furthermore, although Mr. DeFrancisco testified at one point in his deposition that "7-Select" is not a proprietary product, that testimony is not as absolute as it may appear at first blush. Mr. DeFrancisco had been provided with a copy of Exhibit G from 2004 and asked whether "7-Select" was considered a proprietary product. He answered no "[b]ecause it's not listed." DeFrancisco Dep. 54:14–17. However, Mr. DeFrancisco explained that 7-Eleven "did not have a private brands program or 7-Select program in 2004." *Id.* at 56:24–57:2. When asked if "currently, the 7-Select brand, the products under that brand . . . are 7-Eleven proprietary products," Mr. DeFrancisco responded, "Yes, they are." *Id.* at 56:12–18.

15(b) required MT "to comply with all our [7-Eleven] standards and specifications for all Inventory, including Proprietary Products and other products and services carried, used or offered for sale at the Store."

Accordingly, that "7-Select" was not listed on Exhibit G does not create a dispute of *material* fact where a product need not have been listed to be considered proprietary under the terms of the Franchise Agreements and where 7-Eleven had the discretion to set the standards and specifications for all products carried, used, or sold at MT's stores.[5]

### B.    MT's "Newly Discovered Evidence"

In its summary judgment evaluation of MT's independent contractor claim, the Court explained that "[n]othing in Section 2 prohibits 7-Eleven employees from interacting with or talking with franchisees' employees, and Mr. Chong's testimony does not demonstrate that 7-Eleven took 'control' over MT's employees."  Mar. 4, 2020 Mem. 9 (Doc. No. 84).  The Court continued in a footnote:

> Furthermore, Mr. Chong's testimony that an employee resigned because of the pressure from 7-Eleven field consultants is wholly speculative as to the employee's motive for resigning, or—if based on a statement of the employee—is hearsay.  In that same vein, Mr. Chong's testimony that another employee said he was "intimidated" or that managers overall felt "intimidated" is (1) too vague and sweeping of an assertion to support a breach of Section 2, and (2) speculation as to the managers generally and hearsay as to the individual employee.

*Id.* at 9 n.6.

---

[5]    In one of its arguments, MT asserts that Mr. DeFrancisco "conceded that, if a field consultant were falsely telling franchisees that they have to sell Defendant's proprietary products, that would be a failure to allow franchisees to manage their own stores as they see fit."  Am. Mot. for Recons. 12–13 (Doc. No. 90). Mr. DeFrancisco's opinion is essentially a legal conclusion as to whether 7-Eleven requiring MT to carry "7-Select" would breach the Franchise Agreements by failing to treat MT as an independent contractor. Not only was Mr. DeFrancisco not a corporate designee, and accordingly his opinion does not bind 7-Eleven, but witness testimony that crosses over into legal opinion is inadmissible.  Furthermore, and dispositive of the issue, given his position, Mr. DeFrancisco's subjective beliefs cannot override the objective, express terms of the Franchise Agreements.

MT now offers three affidavits of former managers of MT's stores in an attempt to resolve the speculation and hearsay issues. MT argues that the three former managers, who allegedly could not be contacted previously and were unwilling to testify, have now offered affidavits to avoid the injustice of a summary judgment ruling against MT. MT claims that these affidavits constitute new evidence that was previously unavailable, verify Mr. Chong's testimony, and form a basis upon which the Court can reconsider its summary judgment ruling. MT's arguments, however, are unavailing.

The affidavits state that each former manager "did not want to come forward and testify in this matter or be involved," but has since been inspired to provide testimony after speaking with Mr. Chong and "seeing the unjust summary judgment entered against him." Affs. ¶ 2 (Doc. Nos. 91-1, 91-2, 91-3).[6] This explanation does not move the Court. In its motion for reconsideration, MT vaguely contends that the former managers of MT's stores "could not be contacted and were previously unwilling to come forward and testify." Am. Mot. for Recons. 14 (Doc. No. 90). Yet when challenged by 7-Eleven as to MT's failure during discovery to subpoena the managers or seek the Court's assistance in securing their cooperation, MT expounds in its reply that it did not subpoena the former store managers only because it did not have the burden of proof on 7-Eleven's counterclaim and because it chose to rely on Mr. Chong's testimony in supporting its own claims.

---

[6]     The Court is able to cite the same language from all three managers' affidavits because the substance of each affidavit is entirely identical, a fact which does not inspire confidence. Furthermore, portions of the affidavits mirror MT's own opposition brief filed in response to 7-Eleven's motion for summary judgment. *Compare* Affs. ¶¶ 6–7 (Doc. Nos. 91-1, 91-2, 91-3) ("Defendant forced us to buy a plethora of products by listing the merchandise on Defendant's online merchandise order system as one of four classes . . . . Defendant's 7-Select and food products are commonly classified as required, focus or core, even though they are not among the 11 Proprietary Products that Plaintiff is required to sell pursuant to Exhibit G of the Franchise Agreements.") *with* Pl.'s Opp'n 19–20 (Doc. No. 58) ("Defendant forced Plaintiff to buy a plethora of products by listing the merchandise on Defendant's online merchandise order system as one of four classes . . . . Defendant's 7-Select and food products are commonly classified as required, focus or core, even though they are not among the 11 Proprietary Products that Plaintiff is required to sell pursuant to Exhibit G of the Franchise Agreements."). This mirroring is not limited to those portions cited here.

Of particular concern to the Court is that despite MT supposedly being unable to contact the former managers during the pendency of this two-year litigation, MT was suddenly able to obtain notarized affidavits from *all three* individuals a mere 16 days after the summary judgment decision issued and MT became aware that the Court found Mr. Chong's testimony insufficient. *See* Pl.'s Reply 6 (Doc. No. 94) ("It wasn't until the Court raised the issue of hearsay in its ruling that messages were left for the witnesses . . . ."). This is most suspect. *See, e.g., Giordano v. McCartney*, 385 F.2d 154, 155–56 (3d Cir. 1967) (denying motion for a new trial based on newly discovered evidence in the form of two affidavits because plaintiffs failed to "satisfactorily explain[] why no attempt was made to locate and question [the affiant]" and "[t]he ease and speed with which he was found subsequent to trial demonstrates that with the exercise of reasonable diligence he could have been interviewed prior to trial").

"Newly discovered evidence is that which is 'truly newly discovered or . . . could not have been found by due diligence.'" *Atl. States Legal Found., Inc. v. Karg Bros., Inc.*, 841 F. Supp. 51, 56 (N.D.N.Y. 1993) (quoting *United States v. Potamkin Cadillac Corp.*, 697 F.2d 491, 493 (2d Cir. 1983)). The urgency with which MT collected the three affidavits could and should have been applied earlier in the litigation if MT believed the evidence was crucial to its case. MT's own arguments, as well as the time in which MT was able to secure the affidavits after the Court's ruling, indicate a purely strategic decision on the part of MT to not subpoena the managers earlier simply because MT did not think it was necessary, not because doing so was beyond MT's ability at the time. This strategy failed, and now MT submits this "new" evidence in an attempt to get a second bite at the apple. However, MT's failure to secure what this Court finds to be previously available evidence is not a proper basis upon which to grant reconsideration.

Even if the Court determined that the affidavits constituted newly discovered evidence, reconsideration would not be warranted. The affidavits submitted focus on the methods used by 7-Eleven to allegedly force the former managers to purchase and sell inventory that was not required in the Franchise Agreements, including "7-Select."[7] As previously explained, the Court's central holding was that Section 2 did not impose any duties on 7-Eleven. MT's arguments and evidence, including the three affidavits, related to merchandising and 7-Eleven's alleged interference with MT's employees have no bearing on that central holding. Therefore, MT's "newly discovered evidence" cannot entitle it to reconsideration.

### III.    7-Eleven's Counterclaims

Finally, MT and Mr. Chong argue that the Court erred in granting summary judgment on 7-Eleven's counterclaim against them because the Court weighed the evidence and the credibility of 7-Eleven witness Wade Newman.[8] They contend that Mr. Newman's report and supporting documents, as well as his credibility, go to the weight of the evidence and should be resolved by a jury. MT and Mr. Chong also dispute the Court's dismissal of their argument that Mr. Newman admitted under oath that MT's alleged theft was never witnessed and that it was possible that the audits of MT's stores were inaccurate. They claim that a jury could reasonably doubt Mr. Newman's conclusions based on these statements because "he himself admits that it's possible that Plaintiff did not actually misreport anything." Am. Mot. for Recons. 16 (Doc. No. 90).

---

[7]    Again, the Court's attention is drawn to text from the three affidavits that finds its origins in MT's summary judgment opposition brief. *Compare* Affs. ¶ 9 (Doc. Nos. 91-1, 91-2, 91-3) ("Defendant's field consultants have pressured and harassed us into purchasing 7-Select products for the stores, and falsely stated to us that the 7-Select items were required") *with* Pl.'s Opp'n to Mot. for Summ. J. 19 (Doc. No. 58) ("Defendant's field consultants have pressured and harassed Plaintiff into purchasing 7-Select products for the stores, and falsely stated to Plaintiff that the 7-Select items were required.").

[8]    Wade Newman is a retired 7-Eleven employee who worked for 37 years in accounting and financial roles. Mr. Newman provided descriptions of 7-Eleven's accounting procedures and MT's alleged accounting issues.

The Court reiterates that mere disagreement with its prior ruling is not a proper basis for a motion for reconsideration. The Court has already addressed these contentions:

> MT argues that summary judgment against it should be denied because 7-Eleven has not clearly established the existence of MT's breach. MT points to Mr. Newman's deposition testimony and claims that Mr. Newman "admitted under oath" that 7-Eleven only has a "suggestion" of an attempt by defendant to defraud 7-Eleven. Opp'n to Mot. for Summ. J. 11. MT also highlights that Mr. Newman admitted that the alleged "theft" was never "witnessed," and that it is possible that that audits of MT's stores were inaccurate, which could explain the cash reporting discrepancies and alleged fraud. *Id.*
>
> However, MT mischaracterizes Mr. Newman's testimony. For example, Mr. Newman may have used the word "suggest," but when read in full, Mr. Newman's testimony does not cast doubt on the fact that MT had underreported its merchandise sales: "We have inconsistencies that suggest a purposeful attempt to fraud. We have an action that benefits the franchisee financially from doing it; in other words, there's motive for doing it. And all of that leads us to develop the financial model that quantifies the activity and also the impact to 7-Eleven." Newman Dep. 78:2–8. Similarly, Mr. Newman may have admitted that he never witnessed the fraud in one of MT's stores firsthand, but he qualified this statement and explained that he could nonetheless "see in the financial records that it occurred." *Id.* at 83:1–7. And although Mr. Newman may have admitted that "it's possible" that 7-Eleven's financial audits were "inaccurate," he also qualified this statement by explaining that it was "highly unlikely." *Id.* at 90:7–12. Unlike MT would have the Court believe, Mr. Newman does not cast doubt on the existence of the underreporting.

Mar. 4, 2020 Mem. 16–17 (Doc. No. 84).

MT and Mr. Chong claim that their arguments at summary judgment were not intended to make the Court believe that Mr. Newman doubted his own conclusions, but rather to show how a jury could reasonably doubt Mr. Newman's conclusions. But the Court did not speak in terms of Mr. Newman's subjective beliefs regarding his own testimony. The Court held that the portions of Mr. Newman's testimony MT and Mr. Chong relied on objectively "d[id] not cast doubt on the existence of the underreporting." *Id.* at 17. This supposed reframing by MT and Mr. Chong has no impact on that conclusion.

The Court also did not weigh Mr. Newman's credibility or resolve any disputes. Rather, the Court's explanation served to illuminate that no such disputes existed, despite MT's and Mr. Chong's arguments to the contrary. And regardless, the summary judgment standard "does not require a court to turn a blind eye to the weight of the evidence; the 'opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Furthermore, MT and Mr. Chong offered no evidence to rebut Mr. Newman's assertions. Instead, they attempted to create a dispute of material fact within Mr. Newman's own testimony. But "an opponent [of a motion for summary judgment] may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)); *see also Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper.") (citation omitted). Therefore, MT and Mr. Chong have failed to identify a proper basis for reconsideration of the Court's decision on 7-Eleven's counterclaims.[9]

---

[9]     MT argues that even if the Court will not reconsider its summary judgment ruling on 7-Eleven's counterclaims, "the judgment for Defendant's Counterclaim would be offset by a finding by a jury in favor of Plaintiff's [sic] for Plaintiff's claims against Defendant, since Plaintiff's damages are approximately $600,000.00." Am. Mot. for Recons. 16 (Doc. No. 90). The Court has granted summary judgment on MT's claims against 7-Eleven and denies the motion for reconsideration. Therefore, there can be no jury finding in favor of MT and, as a result, no offset.

CONCLUSION

For the foregoing reasons, the Court denies the motion for reconsideration. An appropriate

order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

14